SULLIVAN (MILLER v.). See Case No. 9,-592.

## Case No. 13,596.

SULLIVAN et al. v. PORTLAND & K. R. CO. et al.

[4 Cliff. 212.] [1]

Circuit Court, D. Maine. April Term, 1874. [2]

COURTS — FOLLOWING STATE DECISIONS — LIEN— RAILROAD COMPANIES — PREFERRED STOCK — MORTGAGE — SETTING APART FUND — USURY — STATUTE OF LIMITATIONS.

1. Where the supreme court of the state in which the circuit court is held, has decided that the foreclosure of a mortgage, under the law of that state, was bona fide, and in conformity with the state law, such judgment must be held as furnishing the rule of decision to the federal court, except perhaps upon the question, whether the law of the state, providing for such foreclosure, was constitutional.

2. The term lien includes every case in which personal or real property is charged with the payment of a debt.

3. Equity acknowledges liens which cannot be enforced at law; but an equitable lien, though not necessarily creating a property in a thing, must amount to a charge upon it, so that it may be recognized and enforced in a court of justice.

4. Certificates of stock, known as old preferred stock, were issued by a railroad corporation. Persons holding the certificates were promised ten per cent interest by the corporation which issued them, but they were not secured by any mortgage or collateral. Other mortgages were subsequently put upon the road, and the trustees of the second mortgage took possession of the road, and held it long enough, under the state law, for their title to become absolute, as against the mortgagors in trust for the respective holders of the second-mortgage bonds. They then formed themselves into a new railroad corporation, under the state law, to carry on the business of the road. About two years after the certificates above named were issued, the stockholders of the old corporation authorized the directors to waive, in behalf of the company, their existing right to redeem at pleasure, and make the road irredeemable until eighteen years after, provided the holders of the certificates should empower the trustees to pay four per cent of the stipulated interest to the treasurer of the corporation, to be held and appropriated, as far as might be, to the payment of the interest of such holders of preferred stock as should surrender their old certificates and receive new six per cent ones. Nothing was done by either party to carry out the proposal of the stockholders to waive their right to redeem the first mortgage, until about a year after it was made, when the directors voted that the new certificates should be issued to holders of preferred stock for the amount surrendered, promising six per cent instead of ten, as in the old certificates. The claim of the complainants was founded upon the issue of the original certificates, coupled with the relinquishment of the four per cent promised to the holders of certificates under the first mortgage, which was remitted subject to the stipulation of the old corporation, that the amount should be held by the treasurer, to be applied to the interest promised the preferred stockholders. Bill in equity to set aside the foreclosure, and to recover the four per cent interest remitted by the holders of the first mortgage certificates in favor of such holders of preferred stock as accepted the stockholders' proposal. *Held*, these contracts were not obligatory on the old corporation, because they stipulated a higher rate of interest than then permitted by the law of the state, which was six per cent.

5. It made no difference that the contract specified in the old certificates, that the four per cent annual interest remitted in excess of the legal rate should be held by the treasurer, to be applied to the payment of interest to such of the holders of preferred stock as should adopt the proposal of the stockholders, because both agreements rested in executory contract, and contemplated a rate of interest not permitted by law.

6. Ten years had elapsed from the date of the indorsement upon the certificates, before the trustees of the second mortgage conveyed the property to the new corporation, and no steps were taken to set apart the same, or any part of the same, to be applied as stipulated in the proposal of the stockholders. Seventeen years elapsed from the indorsement on the certificates issued under the first mortgage, and nothing was done by the holders of those certificates to require either the old or new corporation to make any such payment, or set apart the four per cent remitted for the purpose claimed in the bill of complaint. *Held*, the claim against the old corporation was barred by the statute of limitations.

[See Badger v. Badger, Case No. 718.]

7. All that portion of the claim which arose before the conveyance under which the new corporation claimed to hold, was therefore invalid. *Held*, that the complainants could not recover that part of their claim arising six years next before the filing of the bill of complaint, because the conduct of the parties to the stipulation indicated that they regarded it as of no effect, and as nothing was done to show that the new corporation, in accepting their title, assumed any obligation in that particular.

8. The contract for the ten per cent was usurious, and the contract to apply the excess in the manner contemplated by the indorsement of the first mortgage certificates, would not constitute a lien which could be enforced at law, or in equity, against a subsequent purchaser of the mortgaged property.

9. The unexecuted promise did not constitute any vested interest in the corporate estate, real or personal.

10. Slight evidence may be sufficient in equity to show an assignment or setting apart in equity of a fund in a case like the present; but here there was no evidence whatever.

11. If the agreement for the setting apart of the four per cent was valid, the remedy for the breach of it was against the old corporation.

12. Acquiescence in the course pursued by the old corporation in this respect was laches on the part of the complainants.

13. Courts of equity, in cases of concurrent jurisdiction, consider themselves bound by the statute of limitations which govern courts of law in such cases. In other cases they act upon the analogy of the limitation at law.

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

[2] [Affirmed in 94 U. S. 806.]

14. There is also a defence, peculiar to courts of equity, founded on the lapse of time and staleness of the claim. where no statute of limitations governs the case. In such case, courts of equity often act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands. by refusing to interfere where there has been gross laches in prosecuting. or long acquiescence, in the assertion of adverse rights.

Bill in equity [by Richard Sullivan, trustee, and others, against the Portland & Kennebec Railroad Company and others], to set aside a foreclosure of certain trustees of a second mortgage upon a railroad, and to recover certain remitted annual interest by the holders of the certificates under the first mortgage—such remittance of interest having been made in favor of such holders of preferred stock as would accept a proposal of the stockholders to empower certain trustees to pay four per cent of the interest named in the certificates, to the treasurer of the company, to be applied in payment of interest to such holders of preferred stock as would surrender their old certificates and receive new six per cent ones instead. The respondents were incorporated on the 1st of April, 1836, with all the rights, privileges, and immunities incident to corporations, and subject to the liabilities and duties prescribed in the act passed in the same year concerning corporations, and they were authorized and empowered by their charter to locate, construct, and maintain a railroad, commencing at a point in the city of Portland, and thence passing through the towns of North Yarmouth, Freeport, Brunswick village, and Topsham to Gardiner village, thence to Hallowell village, thence to Augusta village, on the west side of Kennebec river. Due location of the railroad was made as authorized, and the corporation made four mortgages upon the same, to enable them to construct and equip the railroad, and to discharge the indebtedness which they incurred to effect those objects:—By the mortgage, dated April 30, 1850, called the Yarmouth mortgage, they conveyed that portion of the railroad between North Yarmouth and Portland to Reuel Williams, John Patten, and J. B. Carroll, as trustees, to secure $202,-400, advanced to the company by contributors, for which the corporation issued to the contributors certificates creating a lien upon the railroad for the payment of the principal and ten per cent annual income. Advances were also made by sundry cities, towns, and individuals, for which loans the corporation, on Nov. 1, 1850. mortgaged the whole line of the railroad to the commissioners of the sinking fund, which advances amounted to $800,000. Bonds were also issued by the company on Oct. 17, 1851, to the amount of $230,000, and the corporation mortgaged the railroad to John Patten, Joseph McKeen. and M. S. Hagar, to secure the payment of the principal and interest of the same to the holders. Contributors, secured by the first-named mortgage, were, by the terms of the certificates. entitled to ten per cent annual interest, but the stockholders of the corporation, on the 7th of October, 1852, authorized the directors to waive, in behalf of the company, their existing right to redeem, at pleasure, the road from North Yarmouth to Portland, and to make the same irredeemable until November. 1870, provided the holders of the said certificates should authorize and empower the trustees to pay over four per cent of the stipulated annual interest to the treasurer of the corporation, for the use and benefit of the company, to be held and appropriated, so far as might be required, or as the same might go, to the payment of interest to such of the holders of preferred stock as should surrender their old certificates and receive such new six per cent certificates in their stead. They, the stockholders, also voted at the same meeting, that in case such an arrangement should be effected with the said contributors, that the amount, so paid into the hands of the treasurer, should be by him reserved and appropriated, so far as it might be required, or as the same might go, to the payment of the three per cent semi-annual interest, to such of the holders of the preferred stock as should so surrender their old certificates, and receive such new six per cent certificates in lieu of those surrendered.

The funds obtained from those sources were insufficient to complete the enterprise, and the corporation, on the 15th of October. 1852, made another issue of bonds to the amount of $250,000, and mortgaged the railroad to the same trustees, to secure the payment of the same, which bonds were known as the second-mortgage bonds. Nothing was done by either party in execution of the proposal of the stockholders of the corporation, to waive their existing right to redeem the first or Yarmouth mortgage at pleasure, and to make it irredeemable for the period mentioned in that vote, until March 4, 1853, when the directors voted that whenever the arrangement contemplated by that proposal should be completed, the president and treasurer should be authorized to issue new certificates to holders of preferred stock for the amount surrendered, promising six per cent annual interest instead of the ten per cent promised in the old certificates, and that such new certificates should entitle the holders thereof to all the privileges and benefits of the votes constituting the said proposal. Power to issue such certificates to such of the holders of preferred stock as should surrender their old certificates and accept such new certificates, was conferred upon the president and treasurer of the company at the meeting of the directors, held July 16, 1853, and the directors also voted that the holders of such new certificates should be entitled to a lien upon the four per cent annual interest, to be paid to the treasurer by the trustees of the said contributors, pursu-

ant to the original proposal of the stockholders. Such holders of the old certificates never did any thing, so far as appears, to signify their acceptance o: the proposal of the stockholders, until Sept. 1, 1853, when the first new six per cent certificate was issued by the directors of the company. All the other six per cent certificates were executed subsequent to that date, within the same year. By the terms of the certificates the company waived their right to redeem the mortgage until the time mentioned in the proposal, and in consideration thereof the respective holders of the surrendered certificates covenanted to direct the trustees to pay over to the treasurer four per cent of the annual interest promised by the old certificates, it being stipulated in the certificate that the four per cent should be held by the treasurer, in trust, to be applied as provided in the original vote and proposal of the stockholders. Special authority was conferred upon the old corporation, by the act of the legislature of April 1, 1856, to let or lease their railroad, franchise, and property for hire, or to contract for the running and managing of the same, with any individual or other railroad corporation, for a term of years; and the act also provided that the lease or contract so made with such individual or corporation, should be deemed valid and binding. Sp. Laws 1856, p. 734. Pursuant to that authority and the vote of the directors of Aug. 18 1856, the president of the corporation entered into an arrangement with the trustees of the holders of the second-mortgage bonds, whereby the trustees were authorized to take possession of the railroad upon certain conditions, of which the fourth was that they should pay five per cent semi-annually on the mortgage to the trustees of the contributors, for building the Yarmouth part of the railroad. Express authority was conferred upon the trustees by that agreement, not only to take possession of the railroad, but also to hold the same until the interest due upon the bonds should be paid, subject to the terms and stipulations therein set forth. New statutory regulations were passed by the legislature on the 15th of April, 1857, providing for the foreclosure of certain mortgages given to secure the payment of bonds and coupons issued by railroad corporations. Sess. Acts 1857, p. 44.

Actual possession of the railroad was taken by the trustees named in the second mortgage on Sept. 1. 1857, under the agreement, but the earnings of the railroad proving quie insufficient to accomplish the contemplated objects, or to meet the specified conditions of the agreement, it was treated as inoperative at the end of the first year. Interest upon the second-mortgage bonds was payable semi-annually, and by reason of the non-payment of the same for a long period, and for a large amount, more than one-third in amount of the bondholders, on April

15, 1859, made due application to the trustees named in the mortgage, requesting them to take the necessary steps to foreclose the mortgage, and the trustees having complied, in all respects, with the request of the petitioning bondholders, subsequently in the same year took possession of the railroad, franchise, and furniture, and having observed and fulfilled the requirements of the law in such case made and provided, and having continued in the possession and enjoyment of the mortgaged property for the purpose of foreclosure, more than three years from the time such possession was taken for that purpose, the title of the trustees to the mortgaged property became absolute, as against the mortgagors in trust for the respective holders of the second-mortgage bonds. Absolute title to the mortgaged property, as against the mortgagors, having become vested in the trustees named in the second mortgage, in trust for the respective bondholders, the latter, on Nov. 5, 1862, formed and organized themselves, pursuant to the general law of the state, into a railroad corporation, under the name of the Portland and Kennebec Railroad Company, and adopted by-laws, and elected the necessary officers to constitute the association a legally established and duly organized corporation, and they were the other corporation respondents named in the bill of complaint. Accrued interest to a large amount was due and unpaid to the bondholders under the mortgage of Oct. 17, 1851, and it appeared that the trustees named in the mortgage on the 1st of September, 1860, at the request of the holders of the bonds, took possession of the railroad, franchise, and furniture, for the purposes specified in section 2 of the act of the legislature, giving such authority, and they continued to hold such possession until the 1st of January, 1864, when an arrangement was made by an² between the holders of the first-mortgage bonds and the new corporation, by which the former consented that the trustees named in that mortgage should give up the possession of the railroad, then held in their behalf, to the new corporation formed and organized in the manner already described. Sess. Acts 1857, p. 44, § 3. Full possession of the railroad was accordingly surrendered to the new corporation, and the surviving trustees named in the second mortgage, one having deceased, on the 1st day of January, 1864, conveyed to the new corporation all the right, title, and interest they held therein, in trust, by virtue of the second mortgage as foreclosed for the said breach of condition.

A. G. Stinchfield and Strout & Gage, for complainants.

J. H. Drummond A. Libbey, and J. W. Bradbury, for respondents.

CLIFFORD, Circuit Justice. Two principal questions are presented for decision by

the claim of the complainants. They contend that the foreclosure of the second mortgage, under which the new corporation claim title to the mortgaged property, was illegal and void.

But, whether so, or not, they claim that they and all others holding the six per cent certificates are entitled to recover their proportion of the four per cent annual interest so remitted and paid over to the treasurer, whether paid during the possession of the old or the new corporation, as the latter, as the complainants insist, took their title, if any, with notice of all the said votes, stipulations, agreements, and alleged liens, and of the alleged trusts, imposed upon the old corporation by virtue of the arrangement, and they also pray for an account and for an injunction, as set forth in the bill of complainant.

Since the decision of the state court in the case of the old corporation against the new one, it must be assumed that the foreclosure was bona fide, and in strict conformity to the state law, as the decision in that case, whether the judgment be held to be a legal bar to the present suit or not, must be regarded as furnishing the rule of decision to the federal courts in all such respects, as it is plain that every objection now taken to the foreclosure, except perhaps the one that the state law already referred to, providing for a foreclosure in such cases, is unconstitutional, was fully presented to the state court, and was by that court directly overruled. Kennebec & P. R. Co. v. Portland & K. R. Co., 59 Me. 20. Viewed in that light, it is quite clear that the only questions of much importance now open for decision in the case are as follows: (1) Whether the state law providing for foreclosure, as applied to this case, is a constitutional law. (2) Whether the claim of the complainants that the new corporation is liable to them in this suit for the four per cent annual interest, remitted by the holders of the Yarmouth certificates, and paid over as heretofore explained, can be sustained.

Construe the prior law of the state as it was construed by the state court in that decision, and it is obvious that the first proposition of the complainants cannot be sustained, as the later statute does not differ, in the particular mentioned, from the prior law which was in force at the date of the mortgage.

Beyond all doubt, it was competent for the state court to construe the prior law, and it is equally clear that the law as construed by the state court, furnishes the rule of decision in the federal courts; and if so, it follows that the latter act is not repugnant to the former, and if not, every possible ground of complaint is removed, which is all that need be said upon the subject. Kennebec & P. R. Co. v. Portland & K. R. Co., 59 Me. 47.

Grant all that, and still it is insisted by the complainants that their claim for the four per cent annual interest remitted by the holders of the Yarmouth certificates is still open, and that the claim is unaffected by that decision, or by the foreclosure of the second mortgage, or by the deed of conveyance. under which the new corporation hold their supposed title to the mortgaged property.

Grave doubts are entertained whether any branch of the proposition can be sustained, but it may be well to inquire, in the first place, whether the claim could be sustained as against the foreclosure and the title of the new corporation as derived from the deed of conveyance given by the trustees named in the second mortgage, even supposing that the claim is wholly unaffected by the decision of the state court, affirming the validity of the foreclosure. Certificates of stock known as old preferred stock were issued by the corporation to the amount of $240,000, of which $200,000 are outstanding, and unredeemed. Persons holding such certificates were promised ten per cent annual interest by the corporation which issued the certificates, but such certificates of stock were not secured by mortgage nor by any collaterals of any kind, the holders relying entirely upon the promise of the corporation. All of the claim of the complainants is founded upon that issue of certificates of stock, coupled with the relinquishment of the four per cent of the annual interest promised to the holders of the Yarmouth certificates, and which they remitted subject to the stipulation of the old corporation, that the amount remitted should be held by the treasurer, in trust, to be applied, if required, to the payment of the annual interest promised to the preferred stockholders. Made as all these contracts were with the old corporation, it becomes important to inquire to what extent they were obligatory upon the promisors, as the new corporation did not acquire any title to, or possession of, the mortgaged property prior to the date of their deed of conveyance from the trustees named in the second mortgage. Throughout that period, and to the 11th of March, 1870, the legal rate of interest in the state was six per cent, and the law of the state provided that, in any action brought on any contract whatever, on which there is directly or indirectly taken or reserved, a rate of interest exceeding the legal rate, the defendant may, under the general issue, prove such excessive interest, and that it shall be deducted from the amount due on such contract. Rev. St. 1840, p. 317; Rev. St. 1859, p. 322; Sess. Acts 1870, p. 95.

Valid contracts for a higher rate of interest than six per cent may be made since the passage of the last-named "act concerning the rate of interest," but both these contracts were made nearly seventeen years before that act was passed, when, beyond

all doubt, the whole excess beyond six per cent was unauthorized by law, and might have been avoided as usurious. Both parties knew that the rate of interest stipulated in the two contracts was unauthorized by law, nor can it make any difference that the corporation promised, in the indorsement upon the old certificates, that the four per cent annual interest remitted in excess of the legal rate should be held in trust by the treasurer, to be applied to the payment of interest to such of the holders of preferred stock as should adopt the proposal of the stockholders, as both agreements rested in executory contract, and contemplated the payment of a rate of interest not authorized by law.

Ten years and more elapsed from the date of the said indorsement upon the said certificates, before the trustees named in the second mortgage conveyed the mortgaged property to the new corporation, and throughout that period the four per cent annual interest was remitted, or was not claimed, by the holders of the Yarmouth certificates, without any steps being taken by the corporation to set apart the same, or any part of the same, to be applied as stipulated in the said proposal of the stockholders. Nor were any steps taken within that period, or ever afterwards, to the filing of the bill of complaint by the holders of the preferred stock, to enforce that stipulation or to secure the benefit of it in any way whatever. Seventeen years and more had elapsed from the date of the indorsement on the Yarmouth certificates to the filing of the bill of complaint, during all of which time nothing was done by the holders of those indorsed certificates to enforce any such claim, or to require either the old or the new corporation to make any such payment, or set apart the four per cent annual interest so remitted, or any part of the same, for any such purpose as that now claimed in the bill of complaint. Tested by these considerations it is undeniable that the claim against the old corporation, if any they ever had, was barred by the statute of limitations before the present suit was instituted, and that all that portion of the claim which arose prior to the date of the conveyance under which the new corporation claim to hold title, may be dismissed without further remark. Rev. St. 1857, p. 510.

Suppose that is so, still it may be suggested that the claim of the complainants, arising within six years next before the filing of the bill of complaint, is not barred by the statute of limitations, which presents the question whether the new corporation ever became liable to fulfil the stipulation contained in the indorsement upon the Yarmouth certificates, that the four per cent annual interest, so remitted by the holders of the old certificates, should be held by the treasurer of the corporation, in trust, to pay interest to such of the holders of the preferred stock as should accept the beforementioned proposal of the stockholders. Undoubtedly they took their title subject to the rights secured to other parties holding prior mortgage rights, such as holders of bonds or certificates secured by prior mortgages, but the new corporation may well contend that the complainants do not stand in any such relation to their title, as their claim is not secured by mortgage, and as nothing was ever done, either by the complainants or by the old corporation, to set apart the amount promised under that stipulation, or any part thereof, as a fund to be appropriated to that object. Had such a designation of the fund been made by the parties to the stipulation, much weight would be due to the allegation of the bill of complaint, that the new corporation took their title with notice of the claim of the complainants.

But in view of the facts as they existed at the date of the conveyance, it is difficult to see how that allegation can avail the complainants, as the conduct of both parties to the stipulation clearly indicated that they concurred in regarding it as inoperative and of no effect, as nothing had been done, or claimed to be done, to show that the new corporation, in accepting their title, assumed any obligation whatever in that behalf. Notice is alleged in the bill of complaint, but it is expressly denied in the answer, and there is no proof upon the subject, except what may be inferred from the relation which the corporators of the new corporation, or some of them, previously bore to the promisors in the stipulation. Direct proof that the new corporation had notice that the complainants made any such claim, at that date, is entirely wanting, nor can it be maintained even if they had knowledge of the said votes and stipulations, that those votes and stipulations, without more, are sufficient to constitute a lien which was binding and operative, as against the new corporation, for the amount claimed in this suit.

Sufficient has already been remarked to show that this suit is brought to set aside the foreclosure, and to recover the four per cent annual interest remitted by the holders of the Yarmouth certificates, in favor of such holders of preferred stock as accepted the aforesaid proposal of the stockholders of the old corporation. Instituted as the suit was, solely for these two objects, nothing need be said in respect to the right of the holders of the Yarmouth certificates to recover the principal of their loan, and six per cent interest thereon, as no such issue is involved in the record. Attention, therefore, must at present be confined to the claim of the complainants to recover the four per cent annual interest remitted by the holders of the Yarmouth certificates. Unless it can be held that the arrangement between the old corporation and the holders of the Yarmouth certificates amounted to a

valid lien in favor of the complainants, it would seem to be clear that the claim cannot be supported, as it plainly could not be as against the old corporation, and it must be admitted that the new corporation took the absolute title to the mortgaged property, subject only to any legal rights previously vested in other individuals or corporations. Difficulties of an insuperable character stand in the way of the theory assumed by the complainants, that the votes and stipulations referred to amount to a lien upon the four per cent annual interest, so remitted and paid over to the treasurer.

(1) Because the contract to pay ten per cent, of which the four per cent was a part, was usurious, and as such was unauthorized by law.

(2) Because the contract was merely executory, and did not, without more, amount to a lien, even if the contract was legal, as the interest remitted was never set apart to be applied to the described object.

(3) Because the remedy of the party, if the contract was binding, was at law for the breach of it, as the interest, when received, was immediately mingled with the earnings of the railroad, and paid out to meet current expenses

(4) Because the party interested acquiesced in that disposition of the interest for more than seventeen years without complaint, including the whole period of the pendency of proceedings for foreclosure, and for more than seven years after the conveyance by the trustees named in the second mortgage, to the new corporation.

(5) Because both parties to the stipulation in question, up to the date of the conveyance to the new corporation, treated it as a mere executory contract, never indicating by any recorded act that they regarded it as constituting a lien upon any particular fund.

(6) Because the whole claim of the complainants against the old corporation is barred by the statute of limitations.

(7) Because the whole claim of the complainants for the application of the four per cent annual interest is barred by the proceedings of foreclosure.

(8) Because the new corporation took their title, divested of all claims which were illegal, or which were barred by the statute of limitations or by the foreclosure proceedings.

(9) Because the decision of the state court, affirming the validity of the foreclosure proceedings, is a complete answer to the whole claim of the complainants for the four per cent annual interest so remitted and paid over to the treasurer of the old corporation.

(10) Because the complainants were guilty of laches in asserting their claim, having delayed to take any steps to enforce it for more than seventeen years from the time the stipulation was executed.

(11) Because they have been guilty of laches in asserting their claim against the new corporation, having delayed to make the claim for more than seven years since the new corporation acquired their title under the foreclosure and the deed of conveyance from the trustees named in the second mortgage.

(12) Because the complainants were not authorized to institute or prosecute the suit, as it does not appear that the corporation ever refused the same, or to adopt the necessary measures to protect their rights, if any they had, in respect to the claims set forth in the bill of complaint. Mozley v. Alston, 1 Phil. Ch. 790; Foss v Harbottle, 2 Hare, 461.

Enough has already been remarked to show that the contract for ten per cent annual interest was usurious, and that the contract of the promisors to apply the excess in the manner contemplated by the indorsement on the Yarmouth certificates would not constitute a valid lien which could be enforced in law or equity against a subsequent purchaser of the mortgaged property.

Such a contract, even if legal, being merely executory, would not, without more, amount to a lien which could be enforced against a subsequent purchaser of the mortgaged property, as the unexecuted promise did not create any vested interest in the corporate estate, real or personal. Liens may be created by statute or by express contract between the parties, or they may arise from usage, or be implied from the dealings or business relations between the parties, in which latter class of cases the lien is generally displaced by the surrender of the possession. Taken in its widest sense, it is doubtless true that the term lien includes every case in which personal or real property is charged with the payment of a debt; but the question in this case is, whether enough was ever done to charge the mortgaged property with any such obligation. Statute liens depend upon the construction of the statute, and contract liens depend upon the terms of the contract; but the inquiry in this case is, whether sufficient was done to effect the purpose of the parties. Equity indubitably acknowledges liens which cannot be enforced at law, but an equitable lien, though not necessarily creating a property in the thing, must amount to a charge upon it, in order that it may be recognized and enforced in a court of justice. Ex parte Foster [Case No. 4,960].

Obligations of the kind are frequently binding between the parties when they are of no avail against a subsequent purchaser or attaching creditor. Slight evidence may be sufficient, in equity, to show an assignment or setting apart of the fund in a case like the present: but in this case there is no such evidence whatever. On the contrary, the case shows that for eleven years the four per cent was received by the old corporation, without ever recognizing any such obligation, and the amount so received was constantly mingled with the other earnings of the railroad, and paid out to meet current expenses. It is indispensable to the validity of such a lien, say the supreme court, that there should

be a distinct appropriation of the fund and an agreement that the creditor shall be paid out of it, and it is clear that nothing of the kind appears in this case. Wright v. Ellison, 1 Wall. [68 U. S.] 22; Morton v. Naylor, 1 Hill [N. Y.] 583; Hoyt v. Story, 3 Barb. 262; Burn v. Carvalho, 4 Mylne & C. 690; Watson v. Wellington, 1 Russ. & M. 602.

If the agreement was binding, the remedy of the party for the breach of it was at law against the old corporation. Insurance Co. v. Bailey, 13 Wall. [80 U. S.] 621; Hipp v. Babin, 19 How. [60 U. S.] 271.

Acquiescence in the course pursued by the old corporation, in mingling the remitted interest with the other funds of the corporation, and in paying out the same to meet the current expenses of the corporation, without any attempt to institute any proceedings to protect their supposed rights, was gross laches on the part of the complainants. Courts of equity, in cases of concurrent jurisdiction, consider themselves bound by the statute of limitations, which governs courts of law in like cases, and this rather in obedience to the statute than by analogy. In many other cases they act upon the analogy of the limitation at law, as where a legal title would, in ejectment, be barred by twenty years' possession, courts of equity will act upon the like limitation, and apply it to all cases of relief brought upon equitable titles or claims, touching real estate. Wagner v. Baird, 7 How. [48 U. S.] 258; Moore v. Greene [Case No. 9,763]; 2 Story. Eq. Jur. (8th Ed.) 1520; Farnam v. Brooks, 9 Pick. 243.

But there is a defence of the kind, peculiar to courts of equity. founded on lapse of time and the staleness of the claim where no statute of limitation governs the case. Badger v. Badger [Case No. 718]. In such cases courts of equity often act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights. 2 Sugd. Vend. (7th Am. Ed.) 899; Roberts v. Tunstall. 4 Hare, 257; Jenkins v. Pye. 12 Pet. [37 U. S.] 241; Harwood v. Railroad, 17 Wall. [84 U. S.] 81; New Albany v. Burke, 11 Wall. [78 U. S.] 107. Long acquiescence and laches by parties out of possession, are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment caused by the fraud or concealment of the party in possession, which appeal to the conscience of the tribunal exercising jurisdiction in the case. Pecuniary prejudice, of a serious character, must have been occasioned to the new corporation by the delay of the complainants to set up their claim, as the new corporation in the mean time discontinued and abandoned a portion of the original location, and located and constructed a new route instead, and effected a connection not before existing, between their railroad and another railroad which form a continuous line from Augusta to Boston.

Nothing in the nature of an excuse for the delay appears in this case, but both parties, throughout the whole period mentioned, treated the stipulation as inoperative and of no effect.

Self-evident as the seventh proposition is, nothing need be added in its support.

Nor is any argument necessary to uphold the eighth proposition, as the plainest principles of justice would forbid, in view of the circumstances, that the new corporation should be held to pay any claim which is illegal as against the old corporation.

Having shown that the complainants had no valid lien upon the mortgaged property, it follows that the decision of the state court is a complete answer to the whole claim under consideration, as it conclusively affirms the validity of the foreclosure, overruling every objection to it set up in the present suit.

Laches is a good defence, for the reasons set forth in the tenth proposition, which requires no further discussion.

Nor is any further discussion of the eleventh proposition required, as it is fully supported by the authorities already cited, to which one or two more may be added. Hovenden v. Lord Annesley, 2 Schoales & L. 636; McNight v. Taylor, 1 How. [42 U. S.] 168; Smith v. Clay, Amb. 645.

Much discussion of the twelfth proposition is unnecessary. as it is quite clear that those which precede it are sufficient to show that the bill of complaint must be dismissed. Suffice it to say that no steps were taken to secure the co-operation of the old corporation before the suit was instituted, nor does it appear that any request in that behalf was ever made by the complainants. Dodge v. Woolsey. 18 How. [59 U. S.] 341; Bronson v. Railroad. 2 Wall. [69 U. S.] 301; Ang. & A. Corp. (4th Ed.) § 341.

Bill of complaint dismissed, with costs.

[On appeal to the supreme court, the decree of this court was affirmed. 94 U. S. 806.]