THOMAS JACKSON v. JAMES B. KINCAID AND WILLIAM CHITWOOD.

1. PLEDGE—A pledge is a bailment of personal property as a security for some debt or engagement.

2. LIEN—*Includes Pledge.* The term lien includes every case in which personal property is charged with the payment of a debt, and a pledge of personal property is a lien upon it.

3. PLEDGE—*Possession.* In order to constitute a valid pledge there must be an immediate, actual and continued change of possession of the property pledged, as against creditors or subsequent purchasers or encumbrancers in good faith.

4. SAME—*Exclusive Possession Necessary.* And such a change of possession requires the pledgee to hold the property exclusively as a security for the payment of the debt for which the property is pledged.

5. SAME—*When Void.* And where pledgees took possession of the property pledged, which consisted of a stock of goods, and opened them up for sale in a building rented prior thereto by the debtors and in the same name in which a mercantile business had been run and was being carried on by the

debtors at another place, and allowed the debtors to buy a large amount of new goods and place them in the stock, and all were being sold in the usual course of trade, and the money used in payment of freight on goods, rent of building leased by debtors, and for shelving and counters, and other expenses of the store, and the remaining proceeds of the sales deposited in bank in the name of the debtors, and the debtors drew on the same by sight draft, and the remaining balance was never drawn out of the bank or asked for by the pledgees, the transaction is conclusively held to be fraudulent and void as to attaching creditors who merged their attachments into a chattel mortgage given by the debtors.

*Error from the District Court of Logan County.*

## STATEMENT OF THE CASE.

This was an action brought by defendants in error in the district court of Logan county on the 7th day of August, 1894, in conversion, against the plaintiff in error to recover the value of a stock of goods, on which the plaintiffs claimed a pledgee's lien, with interest from the date of the alleged conversion, July 19, 1893. On the trial before the jury on the 6th of April, 1895, verdict was rendered for James B. Kincaid in the sum of $1,514.81, and for William Chitwood in the sum of $1,692.86. After motion for a new trial was overruled, judgment was rendered for the plaintiffs on the verdict. From this judgment the appeal is taken. The general verdict was in favor of the plaintiffs, and there were no special findings of fact. The facts of the case, in order to present the principal question urged, resolving all disputes in favor of the plaintiffs, are as follows:

For some years prior to June 10, 1893, Robert Kincaid and Zalmon Kincaid had been engaged as partners in the mercantile business, having at that time a store at Perry, Iowa; one at Pleasanton, Kansas; one in Brown county, Kansas; and another at Mound City, Kansas; and were interested extensively in numerous banks. At Mound City, Kansas, they had a large stock of goods, and the business was run under the name of the "Regula-

tor." James B. Kincaid, their cousin, had been working for them most of the time since 1881, and was then clerking in the Mound City store, and had never had a settlement with them. On that day, on settlement had, it was agreed that there was $1,370 due him for his wages.

Shortly prior to this Robert Kincaid had gone to Yukon, Oklahoma, and had rented a building in which to open a store; had returned to Kansas and had $7,850 worth, by invoice, of the stock of goods at Mound City boxed and shipped to Yukon.

On the same day, June 10, 1893, Kincaid & Brother borrowed fifteen hundred dollars of William Chitwood, and gave him their note payable one day after date.

Kincaid & Brother not having the money to meet these debts, it was agreed that James B. Kincaid and William Chitwood should hold the stock of goods shipped to Yukon as security therefor, and that the money should be paid within ninety days, or when the Strip opened, or when the parties demanded it, and that they should go to Yukon, take possession of the stock, open it up in the building rented by Kincaid & Brother, and run the business for Kincaid & Brother, and under the style of the "Regulator," and if Kincaid & Brother could not pay these debts when the Strip opened, or when they demanded their money, these goods were to be theirs.

On June 12 or 13, Kincaid & Brother ordered a large bill of goods amounting to $1,053, from Richardson, Roberts, Byrne Dry Goods company, of St. Joseph, Missouri, and these goods were shipped to Yukon, Oklahoma, to Kincaid & Brother, received by Kincaid & Chitwood, and put in with the old stock, and during the latter part of the month the store was opened and the old and new goods sold together in the usual course of trade.

The business was continued in this manner until the

19th day of July, 1893, when the Sims Grocery company and Richardson, Roberts, Byrne Dry Goods company brought attachment suits, the first to recover the sum of $1,020, and the latter the sum of $2,773, and attachment orders issued and levied on the stock.

During the time the store was run in this manner, about four or five hundred dollars worth of goods were sold, and the money was used in paying freight on goods, for shelving and counters, for rent of store and other expenses of the business, and the balance was deposited in bank in the name of Kincaid & Brother, and they drew out of the same by draft, $200, and the balance of the deposit, about forty dollars, remained in the bank and was never asked for by Kincaid & Chitwood.

Robert Kincaid had directed Kincaid & Chitwood to deposit the proceeds of the sales in the bank at Yukon, and let it accumulate there to pay the bill of Richardson, Roberts, Byrne Dry Goods company.

On July 17, 1893, the Hood & Kincaid bank at Pleasanton, Kansas, and of which Robert Kincaid was a member, failed, and this almost immediately led to the insolvency of Kincaid & Brother.

On July 17 Chitwood left Yukon for Mound City, Kansas, and never returned to Oklamoma.   On leaving he told James B. Kincaid: "Hold the fort!   You sell the stock of goods until I get back, or until I hear from you," and never gave him any other directions on the subject.   Shortly afterwards James B. Kincaid returned to Kansas, and never went back to Yukon.

On July 29, 1893, Kincaid & Brother, through Robert Kincaid, who was manager of the business, gave Richardson, Roberts, Byrne Dry Goods company and the Sims Grocery company a chattel mortgage on the stock of goods at Yukon to secure the sum of $2,673.62;

$1020,48 to the Sims Grocery company, and $1,653.14 to Richardson, Roberts, Byrne Dry Goods company. They immediately filed the chattel mortgage, received the stock of goods from the sheriff, who held it under the attachments, advertised it for sale, as provided by law, and sold the stock.

William Chitwood, after he returned to Kansas on July 18, 1893, and after he had learned of the failure of Kincaid & Brother, asked for his money. James B. Kincaid never made any demand for his. Later on a tract of land in Kansas, which was heavily mortgaged, was deeded to James B. Kincaid, the consideration stated in the deed being $1,370, but is testified by him to have been taken as security for his debt. Considering the land worth no more than the mortgage, and desiring to qualify himself to enter land in the Cherokee Strip, he deeded this land to his wife, the consideration stated in this deed being two thousand dollars.

The verdict being for plaintiffs, the facts with reference to badges of fraud, and intentional fraud, need not be considered.

This suit was brought to recover the amount of the claims of James B. Kincaid and William Chitwood, against this stock at Yukon, Oklahoma. Reversed.

*Keaton & Cotteral*, for plaintiff in error.

*George Gardner* and *E. N. Smith*, for defendants in error.

The opinion of the court was delivered by

BIERER, J.: The first error assigned for a reversal of the judgment in this case is the refusal of the court to give the instruction presented by defendants below to the jury, to return a verdict in favor of the defendants.

The defendants presented their case to the trial court on two theories: *First*, that the transaction between Kincaid & Chitwood and Kincaid & Brother, under the undisputed facts of the case, must be held fraudulent in law on account of the failure of the pledgees to take actual and immediate possession of the property and maintain actual and continued possession thereof under § 2663; that as the plaintiffs held the goods for sale in the usual course of trade for Kincaid & Brother, and received new goods for them, to be, and which were being, disposed of in the same manner, and let the money be used by Kincaid & Brother for other purposes than to pay the debt for which the property was a security, the pledge was defeated. *Second*, if this theory was not sustained, that there was a fraudulent intent which, under § 2662 of the Statutes, defeated the pledge.

The plaintiffs claim that the facts presented only a question of the good faith of the transaction, and was a question to be submitted to the jury, whose determination would settle the question of a disputed question of fact. The court adopted the plaintiffs' view of the case.

Section 2662, referred to, provides as follows:

"Every transfer of property or charge thereon made, every obligation incurred, and every judicial proceeding taken, with intent to delay or defraud any creditor or other person of his demands, is void against all creditors of the debtor, and their successors in interest, and against any persons upon whom the estate of the debtor devolves in trust for the benefit of others than the debtor."

Section 2663 is as follows:

"Every transfer of personal property other than a thing in action, or a ship or cargo at sea, or in a foreign port, and every lien thereon, other than a mortgage, when allowed by law, and a contract of bottomry or

respondentia is conclusively presumed, if made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things transferred, to be fraudulent and therefore void, against those who are his creditors while he remains in possession, and the successors in interest of such creditors, and against any person on whom his estate devolves in trust for the benefit of others than himself, and against purchasers or incumbrancers in good faith subsequent to the transfer."

It will be observed that these two sections of the statute denounce two separate characters of fraudulent transfers, and make two clear and well-defined divisions of such cases. The first class is where the transfer is made with the fraudulent intent to delay creditors. The intent there is the gist of the fraud; it is the primal thing. And that under § 2665 is a question of fact, and not of law. The second class of such transfers is the one provided by § 2663, and that makes the transfer conclusively fraudulent where it is not followed by an actual and continued change of possession; and the matter of intent here is not an ingredient of the fraud. It makes no difference what the intent may be under this section, whether it is good or bad. The law has prescribed the rule, regardless of any intent, and that rule is that the transfer is fraudulent unless accompanied by an actual and continued change of possession of the things transferred. Many statutes of frauds make the intent one of the ingredients of the fraud in the latter class of cases, and make the failure to change the possession only a badge of fraud, or a presumption of fraud, which may be overcome by proof. The Nebraska statute, for example, provides that the transfer, unless accompanied by an immediate delivery and followed by an actual change of possession "shall be presumed to be fraud-

ulent and void." Under such a statute there is no conclusive presumption of fraud as there is under ours, and of course authorities under such a statute would not be in point in a case which arises under our statute.

It is claimed, however, by defendants in error, that the case at bar does not come within §2663, because this is a case of pledge, and our statute only provides with reference to transfers of personal property and liens thereon, and that a pledge is neither. This is the very foundation of the plaintiff's case. Can the position be sustained? Is a pledge a lien upon property within the section of the statute, §2663, which we are now considering?

A pledge is defined to be a bailment of personal property as a security for some debt or engagement. (Jones on Pledges, 1; Anderson's Law Dictionary.)

The term lien includes every case in which personal or real property is charged with the payment of a debt. (*Sullivan v. Portland & K. R. Co.*, 23 Fed. Cas. 351; Anderson's Law Dictionary.)

These authorities we think sufficient to fully establish the proposition that a pledge is a lien. In fact, it would be a strained and unwarranted construction to place upon this section to say that it was not. It would require an unusually strong presentment of the matter to make us believe that while the legislature were so plain and direct in denouncing fraudulent transfers and liens upon property, that when, in fact, they adopted the very strongest statute on this question, they left the door to that very class of frauds so widely open by simply allowing the parties to the fraud to call the transaction by the name of pledge and thereby defeat the purposes of the statute. The legislature had no such intention, and the

36——IV.

statute has no such meaning.    It includes a pledge as well as every other character of transfer and lien.

Now was there an actual and continued change of possession of the property?    There is, as we are considering the case, no question, no dispute, as to the facts. The general verdict, without special finding, has resolved all questions of fact in favor of the plaintiffs below.    Both of them testify that the agreement was that this property should be taken to secure the indebtedness due them.    It had already been shipped to Yukon as the property of Kincaid & Brother.    Kincaid & Brother had rented the store building to open the business in.    They went there and opened up the stock. They opened up the store in the name of the "Regulator," which was the name of the store of Kincaid & Brother.    They received a large invoice of goods purchased by Kincaid & Brother.    They put the old and new goods together in this store of Kincaid & Brother, and sold them for Kincaid & Brother in the usual course of trade, in the same manner that the business had been carried on before the alleged pledge was entered into. Finally, and to eternally clinch the transaction, they deposited these monies in the bank in the name of Kincaid & Brother, and permitted them to draw upon this fund, and to divert the proceeds of the sale of these goods to other purposes than those for which they were alleged to be pledged, and this continued up to the time they were seized by attachment.    Whose possession was this when held under such circumstances?    That the possession of the agent is the possession of his principal is too elementary to require the citation of authorities.    We will, however, cite the following:    Ewell's Evans on Agency, p. 330; Bump on Fraudulent Conveyances, 134; *Stoddard v. Butler*, 20 Wendell, 507.

The foundation and policy of the rule that there must be an actual and continued change of possession of the property in order to affect the rights of creditors and subsequent transferors, is to prevent the beneficial use of the property by the debtor.   (Bump on Fraudulent Conveyances, 134.)

This forcible language is used on this subject by Mr. Justice Bronson, in the case of *Stoddard v. Butler, supra:*

"But it is said that the vendees made the vendor their agent, and that the possession of the agent is the possession of the principal.   This is not a new device to get round the statute; but if it succeed, this will be a new and most fortunate era for fraudulent debtors. They can place their goods beyond the reach of creditors and still retain the beneficial enjoyment, *provided* the friend who takes the transfer will declare the vendor his agent.   Such an attempt to cheat the law cannot succeed."

It will be observed that in this case the learned justice points to an exception to the rule where the possession of the agent cannot strictly be held to be the possession of the principal; but this exception is made to prevent fraudulent transfers, and not to assist them, as is sought to be done in the case at bar.

Further on in this case the learned justice, partly quoting from Chief Justice Kent, and partly in his own language, said:

" 'The attempt to screen these constant, essential, and conclusive acts of ownership, under the authority of an agent, is a shallow artifice, destitute even of the merit of plausibility.'   There must be an actual and substantial change of possession; a divided enjoyment, which leaves the vendor to appear to the world as owner will not answer.   In *Page v. Perchard,* (1 Esp. r. 205), the plaintiffs, on taking a bill of sale of a Mrs. Spencer, who kept a public house, put a third person in possession.

But it appearing in evidence that the vendor had been permitted to sell liquor in the usual way of her trade, Lord Kenyon held the sale void as against creditors, and non-suited the plaintiffs."

The most that could be said of the possession of Kincaid & Chitwood is that they had the goods in their custody, but they were retaining such custody for the beneficial use of Kincaid & Brother. They were not holding possession actually, fully, absolutely and continuously for themselves.

It was certainly nothing more than a joint possession, and that is not sufficient under the statute. (Bump on Fraudulent Conveyances, p. 137.)

In the case of *Stiles v. Shumway*, 16 Vermont, 435, which presents many marks of similarity of possession and beneficial use to the case at bar, the learned court said:

"They all continued to live upon the farm as before. The vendor worked upon it, and both the vendor and the vendee used the mare and oxen, and the young stock was pastured on the farm. The verbal agreement between Wait and the plaintiff, or between the plaintiff and his father, can have no effect in changing the possession."

In the case of *Regli v. McClure*, 47 California, 612, the debtor made a transfer to the purchaser for a valuable consideration, and he started in company with the debtor and others to move the property, which consisted of cattle, to another county. The vendor and his family accompanied them, but did not assist in driving the cattle. The cattle were attached by creditors and, on trial, verdict was had for the purchasers. The court said:

"The verdict of the jury should have been set aside by the court below. The circumstances disclosed by the evidence do not amount to that change of possession

required by the statute. The conflict in the evidence as to the alleged fraud in the sale of the cattle, if indeed there be any conflict at all, is not substantial in its character. The sale was plainly fraudulent. The jury must have misunderstood the testimony in the case. The verdict can be accounted for in no other way."

Concurrent possession is not sufficient under such a statute. On this subject Wait on Fraudulent Conveyances, § 259, says:

"The authorities seem to be almost unanimous in holding that concurrent possession by the vendor and vendee will not satisfy the rule or the statute requiring a change of possession. 'There cannot, in such case,' said Duncan, J., 'be a concurrent possession; it must be exclusive, or it would, by the policy of the law, be deemed colorable.' Again, it is said to be 'mere mockery to put in another person to keep possession jointly with the former owner.' In *Wordall v. Smith*, 1 Camp. 332, Lord Ellenborough observed:  ·To defeat the execution by a bill of sale, there must appear to have been a *bona fide*, substantial change of possession.  *  *  A concurrent possession with the assignor is colorable. There must be an exclusive possession under the assignment, or it is fraudulent and void as against creditors.' So it is no change of possession to leave the property in charge of the vendor's agent."

This statute demands not formal, but substantial change of possession. It is not the form of the transaction, but the merit of the transaction that the statute looks to. Remedial statutes, statutes which are aimed at the protection of the rights of parties, are not to be defeated in their operation by mere form. It requires a performance in substance, rather than in form, to satisfy it.

On this subject in the case of *Waller v. Cralle*, 8 B. Monroe, 11, it is said:

"An actual change of possession, so far as the thing

sold is susceptible of it, is absolutely necessary to the validity of the sale as to creditors and subsequent purchasers, whenever the vendor at the time of the sale, is in possession of the property.    And this transmutation of possession to be effectual, must not be merely nominal or momentary, but must be real, actual and open, and such as may be publicly known."

In the case of *Stevens v. Irwin*, 15 California, 503, the the court while holding that the statute was complied with in that case, stated in forcible language what was meant by change of possession.    It there said:

"The 'continued change of possession,' then, does not mean a continuance for all time of this possession, or a perpetual exclusion of all use or control of the property by the original vendor.    A reasonable construction must be given to this language, in analogy to the doctrines of the courts holding the general principles transcribed into the statute. . The delivery must be made of the property; the vendee must take the actual possession; that possession must be open and unequivocal, carrying with it the usual marks and indications of ownership by the vendee. It must be such as to give evidence to the world of the claims of the new owner.    He must, in other words, be in the usual relation to the property which owners of goods occupy to their property.    This possession must be continuous—not taken to be surrendered back again— not formal, but substantial."

In the case of *Mead v. Noyes*, 44 Conn. 487, the supreme court in that case, in the able and learned opinion of Mr. Chief Justice Park, in reversing the judgment of the trial court in sustaining the transfer, said:

"Now whether there has been a change of possession of personal property following a sale in any case, so that the sale will be valid as against the creditors of the vendor, is a mixed question of law and fact.    After the facts are all ascertained the law determines whether or not there has been such a change of possession.    It is not enough that the sale was *bona fide*.    It is not enough

that there was a formal change of the possession of the property accompanying the sale. The law requires an open, visible, permanent change of the possession, to make the sale good as against the vendor's creditors, except in certain cases for which the law has provided.

"We think the court erred in applying the law to the facts of this case. The facts do not warrant the conclusion to which the court came. A vendee may be in possession of property as between himself and the vendor, and still his possession may not be sufficient to protect his property from the vendor's creditors."

Upon the question as to whether or not the case is determined by a matter of good faith, or whether, the facts being undisputed, it is a question of law for the court to determine, it is stated in this opinion, partly quoting from prior opinions of the same court:

"The enjoyment of the thing purchased is generally, if not always, the object the purchaser has in view; and his neglect to take possession is, therefore, so unusual and contrary to general experience, as to be very strong evidence that the purchase was only colorable and not real. And the reason of extending it from a mere rule of evidence, calling it a badge of fraud only, and arbitrarily declaring, as matter of law, that it renders the sale void as to creditors, notwithstanding the highest evidence of honesty of the sale, is because it has been thought better to take away the temptation to practice fraud, than to incur the danger arising from the facility with which testimony may be manufactured to show that a sale was honest. * * And as in applying the rule we must look beyond the good faith, or the secret, technical features of the transaction, so purchasers must learn and understand that if they purchase property, and without legal excuse permit the possession to remain, in fact, or apparently and visibly, the same, or if changed for a brief period, to be in fact or apparently and visibly restored, and thereafter in fact or apparently and visibly continued as before the sale, they hazard its loss by attachment for the debts of the vendor, as still, to the

view of the world, and in the eye of the law, as it looks to the rights of creditors and the prevention of fraud, his property.   *   *   But the court has found that the sale was made in good faith, and such we are bound to consider it; still these circumstances require that it should clearly appear that there was an actual, visible and permanent change in the possession of the property.   Was there such a change in the possession?  As said Judge Hinman in the similar case of *Potter v. Payne*, 21 Conn. 377, we are to consider the possession as a stranger to the sale would regard it.   Whom would a stranger have considered in possession in this case?  He would have seen the horse, harness and wagon continuing to remain in the same place where they had previously been kept. He would have seen the vendor using them about his business and for the benefit of his family, apparently in the same way as before.  He would have seen him feeding the horse and caring for the property, using it in the transportation of lumber, coal and other materials, precisely as if he was the owner of the property.  He would have seen these acts repeated, and continued down to the time of the attachment.  We are unable to discover anything which would lead a stranger to the sale to suppose that there had been a change in the possession and ownership of the property.  We must therefore regard the sale, under the rule we have stated, as void against the attaching creditor.  The excuse of the vendee for permitting the vendor to use the property, apparently as his own after the sale, is clearly insufficient.  Such excuses in similar cases have been repeatedly declared insufficient to satisfy the law."

Now, it will be observed that these cases from New York, Kentucky, California and Connecticut are cases which involve the question of the sufficiency of the possession to sustain a sale; while the case at bar was simply one where the property was sought to be pledged as security.   We do not regard this distinction as making any difference in the principle to be applied.   The change of possession, under the statute, must be the same where

the transaction is a lien other than a mortgage as where it is a sale. And the transferor must, during the time of the existence of the lien, be deprived of his beneficial use of the property as fully as in the case of a sale. We can see, and in fact there can be, no difference upon this feature in the cases cited and the case at bar, because of the fact that in those cases the partial possession which the vendor had was actually exercised by him personally, for the possession of the debtors in this case by their agents remained sustantially their own possession. In fact, we consider the case at bar a stronger case than those cases, for in those cases the transfer was of articles of property not consisting of merchandise to be sold, changed and substituted in the usual course of trade, as in the present case. If a distinction is to be made, it certainly should be in favor of this latter class of cases, for the opportunity for the practice of deception and fraud being greater by the owner being allowed to sell the goods and substitute others in their place, the rule if to be different should be made so by being more rigidly enforced.

The same rule which we gather from these cases, where the transaction was a sale, obtains in chattle mortgage cases where the transaction is a security for a debt, under a statute which requires an actual and continued change of possession to make the security valid. This is the character of the Nebraska statute, and there in the case of *Brunswick v. McClay*, 7 Nebraska 137, the action was to recover, by the mortgagees, certain billiard tables and accompanying furniture. The mortgagees, through their agent, had gone to the saloon of the debtor, and, with his assent, taken nominal possession of the property, and had put them in charge of a third party, who was then, and for a long time afterwards was, in the debtor's employ. The court said of the transaction :

" The tables were not removed from the saloon but re-mained there in their usual place, and were used by Gra-ham in his business, and to his profit, precisely the same as he did before Hull (the agent of the mortgagees) went there, and until after the levy was made. This shows beyond a doubt that the 'actual and continued change of possession,' which the statute requires to prevent the presumption of fraud, was entirely wanting."

It will be remembered that the Nebraska statute made the continuance of possession by the debtor only a pre-sumption of fraud. Otherwise, this decision is entirely applicable to cases of liens other than mortgages under our statute.

The cases we have thus far cited have all, except the Nebraska case, which we have cited in this connection because of the direct bearing on the question as to what satisfied the requirement of actual and continued change of possession, been cases of sale, and we would consider these authorities amply sufficient to sustain the view we take of this case without any where the question was considered upon a case of pledge. The reports, however, are not without cases where the principle was considered in its application to a pledge.

The question as to the validity of a pledge, where the change of possession was not actual and continuous, and where the right of disposal and substitution were allowed, was most ably and exhaustively considered by the su-preme court of the United States, in the case of *Casey v. Cavaroc*, 96 U. S., 467.

In that case Charles Cavaroc, Sr. was the president of the National New Orleans Banking association, which was largely indebted to the Credit Mobilier of Paris, which was represented in New Orleans by Cavaroc & Son, their agents. Cavaroc directed the discount clerk of the bank, who had charge of its notes, to select secur-

ities to be pleged to the Credit Mobilier. The clerk selected the securities and placed them in an envelope by themselves, and handed them to Mr. Cavaroc for Cavaroc & Son, who handed them to the cashier of the bank for safe keeping. As some of the securities soon matured, they were taken out of the envelope for collection, and Cavaroc had them collected and renewed in the usual manner by the discount clerk. To facilitate the handling of the notes, and to avoid going to the cashier when a note became due, after a few days the securities were handed back to the discount clerk in the envelope, in order that he might more conveniently attend to their collection and renewal. When any note was paid the money was taken and used by the bank, and other notes were taken and substituted in their place. When renewed, the new notes took the place of the old. At one time quite a large amount of the notes were exchanged for others, because more available in the banks transactions. The entire lot, however, except the exchange of individual securities, appeared to have been kept in the envelope by itself by the discount clerk, who was under the direction of the cashier, in whose hands the notes had been placed for Cavaroc & Son. The claim of Cavaroc was that these notes were pleged for the security of the debt of the bank to the Credit Mobilier. As to the sufficiency of the possession to constitute a valid pledge, Mr. Justice Bradley, speaking for the court, said:

"Was there such a delivery and retention of possession of the collateral securities as to constitute a valid pledge by the law of Louisiana? Clearly they were never out of the possession of the officers of the bank, and were never out of the bank for a single moment, but were always subject to its disposal in any manner whatever, whether by collection, renewal, substitution, or

exchange; and collections, when made, were made for the benefit of the bank, and not that of the Credit Mobilier. Whether constructive possession in the creditor can be affirmed, where an article to which his only title is that of pledge is actually re-delivered to the debtor, with general authority to dispose of it and substitute another article of equal value in its place, is the question we have to meet in this case. Such a re-delivery for a mere temporary purpose, as for shoeing a horse which has been pledged and is owned by the Farrier, or for repairing a carriage which has been pledged and is owned by the carriage-maker, does not amount to an interruption of the pledgee's possession."

The opinion then proceeds to review the three cases which are relied upon by defendant in error to sustain the validity of the pledge in question, which are, first, the case of the sea-captain who pledged his chronometer for a debt, and who was afterward employed by the pledgee as master of one of his ships, and the chronometer placed in his charge to be used on the voyage. It was held that the possession of the pledgee was not lost and that he could recover the chronometer against a person to whom the master had pledged it a second time.

Second, the case where a party pledged a convertible railroad bond, and the pledgee delivered it to the pledgor in order to get it exchanged for stock in the same company, and which was to be returned and substituted for the bond in pledge. Neither the bond nor the stock was returned, and the pledgee brought an action in trover for the bond and recovered its value.

Third, where the proprietors of a brick-yard contracted it out on shares to the brick-maker, agreeing to advance the money to carry on the manufacture of bricks. After the proprietors were paid their advance, the profits were to be divided between them and the brick-maker. The brick were to remain upon the premises, and pledged to

the owner of the yard as a security for the advances, and to be sold by the brick-maker at retail, and as fast as one hundred dollars was procured it was to be deposited in the bank to the credit of the owners. The brick were attached as to the share of the owner, and it was held that the pledge was valid.

Concerning these cases the opinion says:

"All the cases cited, however, show that a bailment to the pledgor for a mere temporary purpose for the use of the pledgee, or for the repair and conservation of the pledge, will not destroy the latter's possession; at the same time, they imply that a redelivery to the pledgor, except for the special and temporary purposes indicated, divests the possession of the pledge, and destroys the pledge."

After reviewing the civil law, the modern French law, the Code Napoleon, certain statutes of Louisiana, and some French decisions, on the question, the opinion further says:

"A different result was had in another case, where certain champagne wines were the object of the pledge, and the debtor had reserved the care of them; and, though the vaults in which they were stored were leased to the creditors, they communicated by open doors with the other vaults of the debtors, where their workmen were employed on the wines, and there was nothing to indicate which were pledged, and which were not, and nothing to prevent a substitution thereof; so that the debtors appeared in possession, and kept up their credit thereby, which they could not otherwise have done. *     *

"From these authorities it seems to be evident that, in the French law at least, the text of which, in this regard, is the same of that of Louisiana, a delivery by the owner of securities by way of pledge, followed by a return thereof to him, for the purpose of enabling him to collect them and apply the money to his own use, on substituting others in their stead, and with general liberty of substitution, and to appear as the owner and possessor

thereof in his dealings with others, (the title of the securities not being transferred to the creditor), is not such a delivery of possession as is necessary to establish the privilege due to a pledge as to third persons. It would be contrary to the very letter of the law to allow such a transaction to have that effect. It would not be mere evidence of fraud, which might be rebutted by counter evidence; but it would be contrary to the rule of law adopted to prevent fraud. In other words, as to third persons it would not be a pledge at all within the meaning and requirements of the law."

It is not claimed that there is any substantial difference between the common law pledge, which is the law on this subject in this Territory, as we have no statute on the subject, and the civil law, or the law of Louisiana, as they appear in this case in the United States supreme court. In this case, too, the argument that it is a question of good faith or bad faith for the jury to determine, is effectually disposed of in this language:

"Bad faith, it is true, would defeat the pledge though the creditor had possession. But want of possession is equally fatal, though the parties may have acted in good faith. Both are necessary to constitute a good pledge so as to raise a privilege against third persons. The requirement of possession is an inexorable rule of law, adopted to prevent fraud and deception; for, if the debtor remains in possession, the law presumes that those who deal with him do so on the faith of his being the unqualified owner of the goods."

It will be observed in that case the term possession as applied to pledge was not considered in any narrow or contracted sense; but a broad and liberal view of it was taken, to promote the purpose of the law. It is true the pledge was defeated, because the pledgee did not retain the possession of the securities; but the conclusion of want of possession was arrived at more by the manner in which the securities were treated than from any question

of their actual custody. They were in the actual posses-
sion of the persons who were designated as the agents of
the pledgee, but they were allowed to be handled and
used and substituted and disposed of at will, for the con-
venience, and even for the benefit of the pledgor. And
it was this character of use principally which led the
court, we think, to the conclusion that the pledge was de-
feated on account of the character of the possession.

In none of the cases which we have cited were the
conclusions based upon any statute which prohibited the
handling of the property transferred, mortgaged or
pledged by the seller, mortgagor or pledgor, but upon
the general policy of the law that the transferor or debtor
cannot be allowed to handle or traffic in the property
sold or on which the security is given, and if he does so
the transfer or lein is void as to creditors, purchasers
and incumbrancers.

In this character of cases the term possession cannot
be weighed in any technical scales, but must be given a
broad and liberal meaning to prevent the very frauds for
which such a statute as we are considering was enacted.

But it is contended by counsel for defendants in error
that the creditors who attached these goods and after-
wards merged their attachments into a chattel mortgage
given by Kincaid & Brother, had notice of the claims
which Kincaid & Chitwood had upon these goods as
pledgees. This notice would have been a potent factor,
indeed, in the case, if their claims were valid, but being
void their notice amounts to nothing. The notice of a
valid claim often prevents the vesting of a right in a
third person, but the notice of a void claim cannot pre-
vent the attachment of a valid right in a third party.
This question is effectually disposed of in the case of

*Smith v. Epley*, 39 Pac. 1016, where the supreme court of Kansas, said:

"It is suggested that the plaintiffs are not attaching creditors, and that, as they took their mortgage with notice of the prior mortgage, the Beck mortgage is not void as to them. It is true that they had notice of the prior mortgage when they accepted their mortgage to secure their claim. Instead of taking a lien by attachment, they preferred a mortgage lien; but, when they accepted their mortgage, they had notice that J. W. Epley had possession of the mortgaged property as the owner thereof, had the absolute control over the same, the absolute right to sell it as he chose, and the absolute control over the proceeds. They knew, therefore, that the Beck mortgage was void, and no lien upon the stock of goods."

It appeared in the case of *Mead v. Noyes, supra*, that when the levy was made "the officer was at the time informed that the property belonged to the plaintiff and was shown his bill of sale of the same, but stated that he had been directed to attach them."

In *Waller v. Cralle, supra*, it is said:

"Waller was apprized of the sale to the plaintiff, Mrs. Cralle, at the time he made his purchase, it is therefore contended, that having notice, he is not such a purchaser as has a right to impeach the previous sale on the ground of fraud. Where, however, a sale is fraudulent, and made to defeat or delay creditors in the collection of their debts, a subsequent purchaser from the fraudulent vendor is not affected by notice of the fraudulent sale and conveyance."

The holding of possession by Kincaid & Chitwood for the debtors, Kincaid & Brother, in their name, and allowing them to buy and put into the stock new goods, to sell the same in the usual course of trade the same as before the pledge, to divert the proceeds to another purpose than the payment of the debt, defeated their claim to

the property.  They cannot be heard to say that they opened the stock of goods for sale in the name of Kincaid & Brother, and ran the store in the same name in which it was run in Mound City, Kansas, permitted Kincaid & Brother to buy new goods from creditors, which were placed in the stock and sold in the usual manner, and the proceeds, which were not diverted to other uses, deposited in bank in the name of the debtors, and drawn out by them, and the business run in all respects the same as it had been run by Kincaid & Brother for years, up to the very moment of the attachment levy, and then to say to those who attached, and whose liens were by Kincaid & Brother merged into a valid chattel mortgage, that they held the possession of those goods for the purposes of a pledge, when these subsequent liens attached, as pledgees.

The conclusion naturally follows, that the plaintiffs having failed to take actual possession of the property pledged, in their own interest, and having failed to maintain a change of possession, for the purpose of a pledge; but having allowed the debtors, through them, to sell and dispose of parts of the property, of which they, the debtors, had the control, if not the possession, at the time the property was sought to be pledged, and the substitution of other goods in the usual course of the business, for the debtors, the pledge was void under § 2663 of the statute.

But aside from this plain, direct, positive and unequivocal statute, the application of which to the facts of this case, in no more vigorous manner than its letter and purpose demands, by the courts, in the prevention of such frauds upon the commerce of our young Territory, we think the transaction before us was fraudulent by analogy to the rule which is applied to chattel mort-

57——V

gage cases, where the debtor, until default, is allowed to retain the possession of the property, as he is under our statute; but where such a handling and use of the property, a stock of merchandise, by the mortgagor, is inconsistent with the idea of a security, and renders the mortgage void as to creditors and incumbrancers.

The reports are full of such cases, a few of which we will refer to in support of this view of the case.

In the case of *Aikin v. Pascall*, 24 Pac. 1039, the supreme court of Oregon held that:

"When it appears either on the face of a chattel mortgage, or by parol evidence, that the mortgagee of personal property has given to the mortgagor the power to dispose of the mortgaged property, and to apply the proceeds to his own use, the mortgage is void as to attaching creditors."

Another strong case is that of *Gallagher v. Rosenfield*, 50 Northwestern. 696, where the supreme court of Minnesota, as late as December, 1891, used this language:

"It will be observed that the mortgage on its face expressly authorized Berwin to sell at retail the stock of goods mortgaged as his own property, in the ordinary course of business. It is the doctrine of this court that such provision made the mortgage fraudulent in law as to the creditors of the mortgagor. (*Chophard v. Bayard*, 4 Minn. 533; [Gil. 418;] *Wllliams v. Horton*. 21 Minn. 187; *Stein v. Munch*, 24 Minn. 390; *Bank v. Anderson*, id. 435; *Mann v. Flower*, 25 Minn. 507.) In this we have adopted the doctrine of the New York courts. In *Southard v Benner*, 72 N. Y. 432, the court uses this language: 'Such an arrangement, included in and making a part of the written instrument of mortgage, would clearly invalidate it as fraudulent in law, as that term is understood; that is, it would be conclusive evidence of fraud in fact, and would be so held by the court as matter of law.' It may be regarded as the settled rule in this state.

."In the cases above cited no reference is made to the distinction suggested here between existing and subsequent creditors of the mortgagor. Berwin's debts were all subsequent to the mortgage, and the plaintiff receiver represents subsequent creditors only. But the rule clearly applies to debts incurred subsequently to the execution of the mortgage, and while the mortgagor is in possession of the goods under it, as in this case, for the reason that the direct and natural tendency of such possession of the property and dominion over it is to enable the mortgagor to hold himself out to the world as owner, with all the outward *indicia* of ownership, and to obtain a credit by reason thereof to which he is not entitled, while the mortgage would operate as a shield or cover to ward off his creditors, and protect the property in his possession from being applied to satisfy his debts. (Bump Fraud. Conv. 123-126; *Bannon v. Bowler*, 34 Minn. 418; 26 N. W. Rep. 237.)"

The recent case of *Smith v. Epley, supra,* is in line with this late Minnesota case.

The same conclusion is reached in *Hangen v. Hachemeister*, 114 N. Y. 566, where the court said:

"In the case of *Southard v. Benner*, 72 N. Y. 424, it was held that if, at the time of the execution of the chattel mortgage upon the stock of merchandise, it is understood and agreed between the parties that the mortgagor may sell the stock and use the proceeds in his business, and the agreement is carried out, the mortgagor making the sale with the knowledge of the mortgagee, the transaction is fraudulent in law as against the creditors of the mortgagor. It was further held in that case that such an agreement might be proved by parol or inferred from the fact that the mortgagee had permitted the sales to be made."

The question of the validity of a chattel mortgage, where the mortgagor was allowed by the mortgagee to remain in possession of the property, a stock of merchandise, and sell and dispose of the same in the usual

course of trade, and convert the proceeds to his own use, was before this court in the case of *Bank of Perry v. Cooke*, 3 Oklahoma, 534, and there the rule for this Territory was announced in terms too positive for uncertainty, and too direct for evasion that:

"Where at the time of the execution of a chattel mortgage, it is understood and agreed between the parties that the mortgagor shall be allowed to remain in possession of the mortgaged property and sell and dispose of the same in the ordinary course of trade and apply the proceeds to his own use, the mortgage is absolutely void as to creditors of the mortgagor.

"It does not matter whether such agreement is oral or in writing, contained in the mortgage or without, if such an agreement was had, the mortgage is fraudulent and void as to creditors."

This, in our judgment, is the doctrine that is supported by the learning of the courts, the demands for the enforcement of fixed and unevasive rules in the transaction of the vast volume of commercial business, and which has for its sure guide the light of reason.

The opposite rule reduces law from a rule of action for all cases which come within its provisions, to the ascertainment of the intent of the parties, a thing of doubtful stability, and depending much upon the elasticity of conscience on the one side, and absolutely unknown to the other, whose rights must be determined, not by the application of a sure rule, but by the often uncertain speculation as to the favorable or unfavorable impression with which the transaction has impressed the jury in their bewildering effort to perform a divine, rather than a human, function, the ascertainment of a purpose in the mind of man.

The application of this rule to cases of this character can do harm to none; it will undoubtedly prevent

injury to many. It only requires that when property is taken as security it be held and treated as a security, and not left to the disposal of a debtor, whose hidden and unfathomable purpose may be to prepare against the day when his creditor is sure to call.

We cannot believe that the contention of counsel for defendants in error, that there is a distinction to be made between chattel mortgage cases and cases of pledge, in respect to this rule governing commercial securities, is tenable. The principle of the two cases is the same. The only difference between a chattel mortage and a pledge in this Territory is that, in the former cases, the debtor retains possession of the property until the money is due, or some other condition of the mortgage deprives him of his right of possession; while in the latter case the creditor must take and hold the possession. In both, the debtor retains title to the property, and in both the transaction is a mere security for a debt. Chattel mortgage cases, then, where the transaction was declared fraudulent because the debtor was allowed the beneficial use, and the disposal, of the property, and the right of substitution, in his own name or for his own benefit, or where the proceeds are not applied to the payment of the debt for which the security was sought to be given, we consider as squarely in point in principle as if they had, in fact, been cases upon a pledge, and not upon a chattel mortgage.

Why should the rights of creditors require that if the security is handled in a commercial way for the benefit of the mortgagor, the lien is void, and a security as a pledge not be governed by the same principle in establishing the rule?

No reason can be assigned. And where this is true, there cannot be a different rule, unless the statute or the

time-honored law on the question has made one, and from neither source has this been done.

In either one of these classes of security the least that can be said is that so long as the property is allowed to be sold and disposed of by the debtor, or in his name and for his use, for all practical purposes the same as before the security was given, the lien is void and the rights of others may intervene.

The waiting for more than a year after the alleged conversion before this action was brought, is a strong indication, also, that this claim that Kincaid & Chitwood were pledgees was a proposition not intended to be relied upon at the time Kincaid & Brother gave the chattel mortgage on these goods and they were sold thereunder.

The instruction asked by the defendants, directing the jury to return a verdict for them on the undisputed facts of the case, should have been sustained. This should be done where there are no disputed facts for the jury to pass upon. (*Sullivan v. Phœnix Insurance Co.*, [Kan.] 8 Pac. 112.) And the court erred in refusing it.

The judgment of the court below is reversed, with directions to enter judgment for defendants below.

Dale, C. J., having presided in the court below, and Scott, J., having been of counsel in the attachment proceeding, not sitting; all the other Justices concurring.