## HALL v. RUSSELL.

No. 9157—Opinion Filed Feb. 4, 1919.

(178 Pac. 679.)

(Syllabus.)

**1. Mortgages—Deed or Mortgage—Determination—Intention of Parties.**

Whether a transaction concerning real estate, evidenced by an assignment of a certificate of purchase of real estate issued by the state. and at the same time a written contract, acknowledging a certain amount due, and agreeing, upon the payment of the same within a certain time, to reconvey, and that upon failure to pay the same within one year the person will deliver up possession, must be determined by a consideration of the circumstances of the case, whether the same was an absolute transfer or was only taken as security. The form of the assignment is not conclusive. The intention of the parties is the only true and infallible test. Their intention is to be gathered from the circumstances attending the transaction, and the conduct of the parties, as well as from the face of the written contract.

**2. Same — Conveyance or Security — Evidence.**

The evidence examined, and held to prove conclusively that the assignment was intended as security only for an indebtedness.

Error from District Court, Oklahoma County; John W. Hayson, Judge.

Action by Robert Hall against C. C. Russell. Judgment for defendant, and plaintiff brings error. Reversed and remanded, with directions.

Erwin & Erwin, for plaintiff in error.

S. H. Hilton and Grant Stanley, for defendant in error.

McNEILL, J. This was an action brought in the district court of Oklahoma county by Robert Hall against C. C. Russell. The petition alleges that on or about the 7th day of January, 1915, the plaintiff was in possession and control of the northwest quarter of section 24 in township 14 north of range 1 E. I. M., the land having been purchased by the plaintiff from the commissioners of the land office of the state of Oklahoma on January 13, 1910; that a certificate of purchase was regularly issued to the plaintiff; that on the 7th day of January, 1915, the plaintiff borrowed from the defendant $559.83, which was due and payable January 1, 1916, and, as security for said money, executed an assignment or transfer of said land to the defendant, Russell; that, before the execution of the transfer, it was expressly understood and agreed that said land was to be held as security, and that same was not to be considered as a sale, and that a written contract was entered into to that effect on the same day, and the plaintiff tenders into court the sum of $559.83, the amount due on the same, and asks to have the transfer or assignment declared a mortgage, and asks to have said assignment or transfer annulled or canceled. There are other allegations in the petition, but they are not essential to this case, The defendant filed his answer, which is a general denial, and admits the transfer of the land to him for $559.83, and states that it was an absolute purchase, and admits that on the same day the assignment was made the plaintiff, Hall, desired a contract to repurchase the land, and states that he gave him a contract of repurchase, which was without consideration. and that he wholly failed and refused to pay the amount due thereon. The case was tried to the court, and judgment rendered for the defendant, and from said judgment plaintiff appeals, and as grounds for reversing said judgment states that the decision of the court is contrary to the evidence, and that the decision is contrary to law.

The facts, as disclosed by the record are

that Robert Hall is a negro, unable to read or write; that he was the possessor of a certificate of purchase of this land; that on or about the 7th day of January, 1915, he was behind on some payments to the school land department, amounting to about $112.70, and that he owed an indebtedness to a person by the name of Elson, in the sum of $333; that he was unable to pay the same; that Mr. Frost, of the school land department, had been to see him a couple of times about collecting the money due the school land department, when the plaintiff informed him that he was unable to get the money, and Frost wanted to know if he could not borrow the money. Hall stated that he had no security to put up for the money, whereupon Frost advised him that he could transfer the certificate of purchase and he would write him up a contract so it could be held as security. Hall made a deal with Russell, and Russell paid the amount owing to the school land department, amounting to $112.71, and was supposed to have paid off the mortgage of $333 to Elson and a claim of $30.30 to C. H. Hiltson. The negro claims that no money was ever paid him. Russell claims that the full amount was paid to him by checks, but no checks have been introduced or shown in the evidence. The possession of the land was never given to Russell, but was retained by Hall. Hall's theory is that this is nothing more than a mortgage or assignment, taken as security. Russell's theory is that he purchased the property, and after purchase Hall desired an opportunity to repurchase, and he gave him a contract to repurchase, but this was not in connection with the contract of sale. The contract entered into was as follows:

"State of Oklahoma, County of Oklahoma,
   "Luther Township—ss.:

"Luther Oklahoma, this 7th day of January, A. D. 1915. This contract made and entered into by and between Robert Hall, of aforesaid state, county, and township, party of the first part, and C. C. Russell, of aforesaid state, county, and township, party of the second part, witnesseth:

"That Robert Hall, party of the first part, hereby agrees and covenants to pay said party of the second part. C. C. Russell, on or before the 1st day of January, A. D. 1916, the sum of $559.83, with interest thereon from date at the rate of 10 per cent. per annum from date.

"C. C. Russell, party of the second part hereby agrees that in the event said party of the first part, Robert Hall, pay said sum of $559.83, interest and all other expenses pertaining thereto, on the 1st day of January, 1916, as set out above, said C. C. Russell hereby agrees to assign, trans.er, sell, and set over to said Robert Hall all his right, title, and interest in and to northwest quarter of section (24) twenty-four, township (14) fourteen N., range (1) one east, Indian meridian, Oklahoma county, state of Oklahoma.

"Robert Hall, party of the first part, further agrees that in the event he fails to pay said C. C. Russell the said sum of $559.83, interest and expenses, on or before the 1st day of January, A. D. 1916, that he, the said Robert Hall, will remove and vacate the above-described premises, and deliver to said C. C. Russell peaceable possession of above-described premises.                    Robert Hall,

                              "Party First Part.
                              "C. C. Russell,
                              "Party Second Part.
"Witnesses:
   "S. H. Hilton.
   "J. A. Cox."

The court found the issues in favor of the defendant, Russell, and against the plaintiff. Plaintiff in error claims that the judgment of the court is contrary to the evidence. There was considerable testimony, and the greater portion of the testimony does not refer to the merits, or this part of the case, but was on the question of whether there had been a tender made of the amount of money due. If this assignment taken was a security, it would be immaterial. The evidence of the plaintiff, Hall, as to this transaction is found on pages 33, 34, and 35 of the case-made, and is as follows:

"Q. What was said about it? Tell the court all that was said there between you and Mr. Russell. A. He said that he would let me have the money, but that he wanted me to make him safe, and I said to him, 'How will I make you safe?' and he said, 'Well, you got to turn this place over to me, and make me safe for my money; and I said, 'Oh, I could not do that; I could not do that:' and he said that was the only way he would or could let me have the money: and I asked him if he could not let me have it for one year, and he said that that's the only way that he could let me have it, and I would have to make him safe, and we made this agreement between ourselves. He said that he would look, and if it was all in good shape, and I would make a contract to turn the place to him if I did not pay the money and the interest, then he would let me have the money, and I told him 'All right,' for us to go and make the contract Q. Was anything said there about a sale? A. Why, no; it was a contract that I would give him the place if I did not pay the note and interest, and we went to have the contract drawn up. I told him that I was willing to make him safe for his money, and I told him that I

would pay it, if I had to borrow it, and he said that was all right, and we went over to the office of Sam Hilton, and he said he would prepare the paper, and he said, 'Robert, I will fix these up. and you can sign them,' and I told him that I could give that as security for the loan, and would pay him the money and then wanted my land released, and he said that would. be all right, I said I would lease this and make the trans.er until I got the money to pay it back, and then we made the contract. Q. What did he make first? A. He made the transfer first and then the contract. Q. Did you sign it? A. Yes, sir. Q. How long after you signed that transfer did you take the acknowledgement, and until you drew the contract? A. Just shortly after; yes, sir. Q. Did you go to Mr. Hilton's office to draw the contract? A. Yes, sir. Q. And that was a part of the transfer? A. Yes: that was a part; yes, sir. Q. Now, what did you do with that contract? A. He said he would put the contract away, and I did not know what they did with the contract until afterwards, when he said that he put the contract in Mr. Clark's hands. Q. This was done that same day? A. Yes, sir. Q. Can you read or write? Can you read writing? A. No, sir. Q. Can you read printing? A. No, sir. Q. Can you read printing well enough to understand that? A. No, sir. Q. Did these parties know that? A. Yes, sir. Q. Did they undertake to describe that contract to you or to read it to you, A. No, sir. Q. Did they tell you what the contents was? A. They told me that I owed them the amount of $559.83, and that time was when I had to pay it."

The evidence of the defendant. Russell, is found on pages 60, 61, 63, and a small part of 62, and is as follows:

"Q. Go on. A. Well, he come and offered to sell me his place, and we talked the matter over, and I told him I did not know whether or not I had the money, and he said, 'Well, I am going up again to the school land department before the board, and that I have tried everywhere and cannot get the money, and I have not got the money and can't get it, and you might as well have it as any one else,' and he said that one of the men from the school land board had come down, and said that he owed $559.67, or something like that, that I believe was it. Q. Did you make a deal with him that day? A. Yes; we did. Q. And he assigned that place to·you? A. Yes, sir. Q. Who was present at that time and where was the assignment made? A. My recollection is that Mr. Bednar, he either drew it up. or wrote on it there: they appeared before him; and he read it over there to all of us there. Q. Did Mr. Hall make any objection to it? A No, sir. Q. Did he know—what, if anything, was said about a loan? A. Not a word. Q. What did you pay him for that place? A. $559.67, I believe

that it was. Q. Was anything said about any other contract at that time? A. No, sir. Q. When, if at all, when in fact did that matter come up? A. Some time after that. Oh, he gave me a contract for that land that day, that time. Q. What did he say about that? A. He wanted me to give him a contract to repurchase it, an option on it. Q. Well, where was that dictated at, if you now remember? A. Well, I know that the contract was drawn up. Q. Were both contracts drawn up at the same time? A. Yes, sir. Q. Did that contract mention that original transfer was made to you? A. No, sir."

The evidence of Mr. Frost is found on pages 72, 73, 74, and 75 of the case-made, and is as follows:

"A. Well I went to see Hall, and of course to collect this money. He was behind with his payments in his land, and I think that was the second or third time that I had been out to see him, and I told him that there had to be something done on this, about that collection and such, and he said that he had no way of getting the money. Well, I asked him if he cou.d not borrow it from some one, or the bank or some one else, and he said that he had no security, and I suggested that he borrow it on his land, and he said that he did· not know how to go about it, and I suggested to him to sign a certificate of purchase and that would get him the money, and put up the certificate of purchase as security, and wrote him up a contract between the two giving him a year to either dispose of his land or to pay the money back, and he was to have a year on this. (Objection. By the Court: "Was to have a year" to be stricken. Exceptions allowed.) Q. Tell the conversation that happened between Russell and Hall when Russell let him have the money, or about that? A. Well, I don't know about that. Q. Did you have any conversation, or did you hear any? A. I did not hear any conversation between Hall and Russell. Q. Well, you got the money that day? A. Hall told me— Q. Don't tell what Hall told you, unless Russell was present? A. No. Q. Well, how much did Hall pay you? A. Paid me $112.71, the account. Q Who paid that to you, Hall or Russell? A. Well. I believe that Russell gave me a check for the money, or Russell's attorney. Q. Were you there when the deal was closed up? A. I was there until I got the money. Q. You was there when Hall assigned the certificate of purchase? A. Yes, sir. Q What was said with reference to whether or not that would be an absolute sale, or he was putting it up as secur;ty? A. Hall and Russell were both present when the certificate of sale was assigne. Q. Any time that anything was said? A. Yes; they were present then. Q. What was said then with reference to when this money was to be paid back? A. Well, the money was to

be paid back within a year. Q. And what was the effect of this assignment made? I mean by that whether or not it was put up as collateral for this money, or was to be an absolute sale, purchase. Tell just what was said between Hall and Russell at any time. A. I did not hear their conversation at all. Q. What was said by Russell to you? A. Russell told me that he would let him have the money while there, if he would assign the certificate of purchase for security. Q. How long was he to let him have it? A. That was about all of the conversation we had. All that I know, I do not know, he did not say anything about what time he let him have the money for, but just told me that about the security. Q. Well, what kind of security would he require, if anything? A. Well, that was all in consideration for the certificate of purchase being assigned to him, that was all of the security that he had. Q. Did Russell say whether or not he would take that as security? A. He said that he would. Q. Now, was there a word said about selling this land to Russell? A. Not that I heard. Q. Well, you were there during the negotiations and the closing up of the matter, and stayed until you got the money? A. I got the money. Q. Just after the certificate of purchase was assigned over? A. Yes, sir."

While there are numerous other witnesses who gave testimony in this case, none appeared to give any testimony on this particular point. This court has held, in the case of Worley v. Carter, 30 Okla. 642, 121 Pac. 669, and Voris v. Robbins, 52 Okla. 671, 153 Pac. 120, that:

"Whether any particular transaction amounts to a mortgage, or a sale upon condition, or with agreement to reconvey upon a contingency, is to be determined by ascertaining whether the transaction was intended as a loan. If there remains a debt for which the conveyance was only a security, and the collection of which may be enforced independently of the security, the whole transaction amounts to a mortgage, whatever language the parties may have used in expressing their agreement. In such cases it matters not that the transaction is evidenced by one or more instruments, or what the writings may or may not show, if, nevertheless, the agreement in fact exists. The real intention of the parties, either as shown upon the face of the writing, or as disclosed by extrinsic evidence, must govern in equity."

The case at bar presents this state of facts: Here the plaintiff is a negro, unable to read or write. He is pressed by the agent of the school land department for the payments past due on his land. He is advised the way to borrow money on this land by giving it as security is to assign his certificate of purchase, and take back a contract to repurchase. This was done. The negro himself says that this was what he understood. He claims he received none of the money, but the same was paid to his creditors. Defendant intimates that the money was paid to the negro, but offers no check or any other evidence of any kind purporting to show that the plaintiff received any money. The defendant, Russell, states that he bought the land, and that it was only an afterthought that Hall desired to repurchase, and that he gave him this contract of repurchase, which was in the nature of a promissory note, and option to repurchase. This contention of the defendant cannot be sustained on account of Russell's own testimony where he himself testifies that both the assignment and contract of repurchase were drawn up at the same time. This excludes his theory that this was an afterthought, but that both contracts were made at the same time. Nothing was ever said about the rent of this land for 1915. At the time of the assignment of the certificate of purchase, Russell did not claim possession, nor the right to the rents and profits for the year 1915. If he had purchased the land in January, 1915, it does not seem reasonable that he would permit the person from whom he purchased it to retain the possession for one year without paying rent on the same. While it is true the trial court found the issues in favor of the defendant, it would seem from this contract the evidence of the defendant himself, taken in connection with the conditions and circumstances surrounding the case, together with the testimony of Frost of the school land department and giving a little credit to the testimony of the negro Hall himself, it would seem to be conclusive that this transaction was not a sale of the premises, nor was it so intended by the parties. While it is true that this court has held, in the case of Voris v. Robbins 52 Okla. 671, 153 Pac. 120:

"The findings of the trial court should be strongly persuasive, and should not be set aside unless this court can say, in equity and good conscience, that the conclusion reached by the trial court was clearly against the weight of the evidence."

The evidence of the defendant himself, when he states that both contracts were drawn up at the same time, and then pleads that the contract of repurchase was made without consideration and after the contract of sale, is not substantiated by his own testimony, and it appears that the finding of the trial court upon this one question is contrary to the weight of the evidence. There is a great

deal of evidence in regard to the question of a tender having been made. The plaintiff tenders the amount in his petition, but whether, prior to the time of filing the petition, a tender was made, is not material and it is not necessary to decide this question. Another ground upon which plaintiff complains is that he was deprived of the right of a trial by jury. This question becomes immaterial upon the finding of the court here made.

The court finds from the evidence that this assignment was taken as security, and the defendant, Russell, holds the land for the use and benefit of the plaintiff, Hall, subject to his lien for the amount of money advanced, together with the taxes paid, and the interest upon the same.

The cause is therefore reversed and remanded, with direction to the trial court to proceed in accordance with the finding of this court.

All the Justices concur.