## ALEXANDER v. PHILLIPS PETROLEUM CO. et al.

## VAN WERT v. SAME.

## REDA PUMP CO. v. ALEXANDER et al.

## REDA PUMP CO. v. VAN WERT et al.

### Nos. 2463–2466.

Circuit Court of Appeals, Tenth Circuit.

July 28, 1942.

Wilbur J. Holleman and Hal F. Rambo, both of Tulsa, Okl. (Edmund Lashley, of Tulsa, Okl., on the briefs), for Clyde Alexander and S. N. Van Wert.

Ray S. Fellows and Villard Martin, both of Tulsa, Okl. (Garrett Logan and Charles R. Fellows, both of Tulsa, Okl., on the briefs), for Reda Pump Co.

Rayburn Foster, of Bartlesville, Okl. (Don Emery, D. E. Hodges, and George L. Sneed, all of Bartlesville, Okl., on the briefs), for Phillips Petroleum Co.

Earl Pruet and Richardson, Shartel, Cochran, Chilson & Pruet, all of Oklahoma City, Okl., for C. C. Brown.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge, delivered the opinion of the court.

On June 15, 1926, Armais Arutunoff was the owner of certain United States patents and applications for patent covering electrically-driven submergible pumps. On that date he entered into a written contract with Phillips Petroleum Company.[1] It provided that Phillips should advance not to exceed $25,000 to Arutunoff for the purpose of testing and developing the devices covered by the patents; that Arutunoff should construct and install in oil wells of Phillips two complete pumping units, in accordance with the patents and applications; that the devices should be operated and completely tested; that if, after the installation and testing of such units, Phillips should be satisfied that the patents and applications covered a feasible, practicable, and useful invention, a corporation should be organized under the laws of Delaware for the purpose of developing, manufacturing, and selling devices and appliances covered by the patents and patent applications; that after the organization of such corporation, Arutunoff should assign to it the exclusive rights to the patents and patent applica-tions in the states of Kansas, Oklahoma, Texas, Arkansas, Louisiana, and New Mexico; that 49 per cent of the stock should be issued to Arutunoff and 51 per cent to Phillips; that Phillips should provide the necessary working capital for the corporation not to exceed $225,000; that the corporation should execute and deliver to Phillips its promissory notes covering the amounts advanced as working capital and that such notes should be payable out of 75 per cent of the net profits of the corporation if, as, and when earned.

On January 4, 1927, Arutunoff and Phillips entered into a supplemental contract which permitted Phillips to advance $30,000 to Arutunoff to exercise an option to purchase from A. R. McGuire a one-fourth interest in the patents and patent applications, provided that Phillips should advance $10,000 to Arutunoff to take care of certain personal obligations of the latter, and, in the event the corporation should be formed, that the $10,000 should be charged to the corporation and repaid out of 75 per cent of the net profits of the corporation if, as, and when earned, and gave Phillips 90 days to investigate the title and ownership of the patents and determine whether the corporation should be formed.

Pursuant to such contracts, Phillips advanced to Arutunoff or his order, $75,000.

On November 10, 1927, Phillips organized the Bart Manufacturing Company.[2] Fifty-one per cent of the stock thereof was issued to Phillips and 49 per cent to Arutunoff. Arutunoff assigned the patents and patent applications to Bart for the states above mentioned. Phillips assigned to Bart all its rights under such contracts. Clyde Alexander, vice president and general manager of Phillips, and Arutunoff were elected president and vice president, respectively, of Bart. Bart constructed a plant in Bartlesville and entered upon the business of manufacturing, selling, and repairing submergible pumps and equipment therefor. Phillips advanced to Bart money, material, supplies, and services of its employees up to April 1, 1930, aggregating $235,000. Bart earned no profits and on March 15, 1930, could not continue operations without obtaining additional working capital. At that point, Phillips was unwilling to make further advancements to Bart, was desirous of securing the return of the advancements it had made to Bart and Aru-

---

[1] Hereinafter called Phillips.

[2] Hereinafter called Bart.

tunoff, and was willing to surrender whatever interest it had in Bart.

On March 15, 1930, a contract was entered into between C. C. Brown, Arutunoff, S. N. Van Wert, and Phillips. It recited the ownership of Bart's stock as follows: Phillips, 510 shares; Arutunoff, 368 shares; Van Wert, 98 shares; I. G. Harmon and Brown, 24 shares. It provided that Brown should organize a Delaware corporation, under the name of Reda Pump Company,[3] with a capital stock of 1,000,000 shares of no par value common stock and 110,000 shares of $10 par value preferred stock; that each of the parties to the contract should transfer all of his shares in Bart to Reda, and that Bart, Arutunoff, and Van Wert should execute and deliver to Reda assignments and transfers of all their rights in the patents and patent · applications throughout the United States; that Brown should pay Arutunoff the sum of $140,000 in cash; that Arutunoff should receive 6,000 shares of Reda preferred stock and 197,760 shares of Reda common stock; that Van Wert should receive 34,110 shares of Reda common stock; that Harmon should receive 4,680 shares of Reda common stock; that in consideration of the payment of $140,000 by Brown to Arutunoff, there should be issued and delivered to Brown, 14,000 shares of Reda preferred stock and 14,000 shares of Reda common stock; that Brown should endeavor to sell 90,000 shares of Reda preferred stock at a price of not less than $10 per share net to Reda.

It further provided that not less than one-half of the proceeds from sales of preferred stock should be paid to Phillips until Phillips had been fully reimbursed for the net amount of money advanced by it to Bart, with interest at six per cent per annum, plus the sum of $75,000 advanced by Phillips to Arutunoff under the contracts of June 15, 1926, and January 4, 1927; that the remainder of the proceeds of the preferred stock should be deposited in the First National Bank in Bartlesville[4] to the credit of Reda, to be used by Reda as working capital.

Paragraph 11 thereof provided that 99,450 shares of Reda common stock[5] should be issued to Brown, endorsed in blank by him, and deposited in the Bank; that if, on or before August 31, 1930, Phillips should

not be paid such advances, the challenged shares should be delivered to Phillips and should become the property of Phillips free of any claim of Brown, his assigns or successors in interest, that all of the 90,000 shares of preferred stock remaining unsold on that date should be issued and delivered to Phillips, that Phillips should retain all sums theretofore paid to it from the proceeds of the sale of preferred stock, and that Phillips should either sell such preferred stock and from the proceeds thereof pay to Reda an amount, which, when added to the amounts received by Reda from the sale of preferred stock, would provide it a total working capital of $430,000, or retain such preferred stock and pay to Reda an amount equal to the difference between the amounts already received by it from the sale of preferred stock and the sum of $430,000; and that if, on or before August 31, 1930, Phillips should receive such advances, then all rights of Phillips under the terms of the agreement should terminate and be at an end.

It provided that Phillips should assign to Reda any and all rights which it held under the contracts with Arutunoff of June 15, 1926, and January 4, 1927.

Reda was organized under the laws of Delaware on March 18, 1930. On March 24, 1930, Arutunoff, Alexander, Van Wert, H. E. Koopman, Ray Hamilton, and Brown were elected directors of Reda. The directors elected Brown as president, Harmon as vice president, H. L. McCracken as secretary and assistant treasurer, and S. C. Beesley as treasurer and assistant secretary, of Reda, respectively. At the first meeting of the directors on March 24, 1930, a resolution was passed adopting and ratifying the provisions of the contract of March 15, 1930, and providing specifically that Reda stock should be issued as provided in such contract, and that upon the assignment and delivery by Phillips of the 510 shares of capital stock of Bart and the assignment by Phillips of any rights under such contracts of June 15, 1926, and January 4, 1927, the challenged shares should be issued to Brown, endorsed in blank by him, deposited in the Bank, and held by it, subject to the terms of the agreement of March 15, 1930.

All the stock of Bart and the patents and patent applications were assigned to Reda.

---

[3] Hereinafter called Reda.
[4] Hereinafter called the Bank.

[5] Hereinafter called the challenged shares.

$140,000 was paid to Arutunoff.[6] 350,000 shares common and 20,000 shares preferred stock of Reda were issued to the persons and in the amounts provided for in the contract of March 15, 1930. Certificates for the challenged shares were issued to Brown, endorsed by him in blank, delivered to the Bank, and held by it, subject to the terms of the agreement of March 15, 1930. Reda acquired all the assets of Bart as of April 1, 1930.

Brown executed an agreement by which he agreed to assign to Van Wert 9,000 of the challenged shares if, as, and when the latter should be issued and delivered to Brown as provided in the contract of March 15, 1930. Brown, Alexander, and Koopman executed an agreement under which Brown agreed to assign to Alexander and Koopman 45,225 of the challenged shares if, as, and when they should be issued and delivered as provided in the contract of March 15, 1930, and Alexander and Koopman agreed to assign to Van Wert 7,500 shares therof. Both of the last-mentioned contracts recited that the challenged shares were to be endorsed in blank by Brown, deposited in the Bank, and held by it, subject to the provisions of paragraph 11 of the contract of March 15, 1930.

Brown did not succeed in selling all the preferred stock. Up to August 27, 1930, he had sold 8,098 shares of preferred for $80,980, of which Phillips had received $39,115. Subsequent to that date he sold 4,945 shares of preferred for $49,450, and Reda received all the proceeds of such sales. On August 27, 1930, after crediting the money received from the sale of preferred stock, there was still due Phillips under the contract of March 15, 1930, $365,000. On that date, Brown and Phillips entered into a contract which provided that Phillips would loan to Brown $365,000 and that Brown would execute to Phillips his note for that amount, bearing interest at six per cent, payable six months from date; that with the proceeds of such loan Brown should purchase from Reda 36,500 shares of preferred and 36,500 shares of common stock, and that the certificates therefor should be endorsed in blank by Brown and placed in the Bank, together with the challenged shares already deposited with the Bank under the contract of March 15, 1930; that if Brown should pay the note, with interest, at the time stipulated in the contract, he should receive the preferred and common stock deposited with the Bank, and that if he should fail to pay the note at the time stipulated in the contract, or as extended by agreement of the parties, the deposited stock should be delivered by the Bank to Phillips and the note canceled and returned to Brown, and that thereupon the contract should terminate.

Alexander and Van Wert consented to the contract of August 27, 1930, and to the deposit of the challenged shares in the Bank, subject to the terms thereof.

It was agreed and understood between Brown and Phillips, although not covered by the written contract of August 27, 1930, that the $365,000 received by Reda from the sale of preferred stock should immediately be paid to Phillips in full satisfaction of the balance due Phillips under the terms of the contract of March 15, 1930.

On August 28, 1930, Phillips gave its check to Brown for $365,000. With the check Brown purchased 36,500 shares of Reda preferred and 36,500 shares of Reda common, endorsed the certificates therefor, and deposited them in the Bank, in accordance with the contract of August 27, 1930. Reda thereupon paid Phillips $365,000, which amount was accepted by Phillips in full satisfaction of the sums due it under the contract of March 15, 1930.

It was intended by Brown and Phillips, and it was understood by Alexander and Van Wert, that Brown should not be personally obligated to pay the note.

Brown failed to pay the $365,000 note when due. It was renewed from time to time, the interest being added to the principal, until a final note was given on June 13, 1934, for $454,296.65 due January 13, 1935. The notes recited that they were subject to the contract of August 27, 1930, deposited with the stock. The last-mentioned note was not paid and on August 26, 1935, Brown and Phillips joined in a letter to the Bank instructing the Bank to

---

6 The $140,000 was realized from a sale of preferred and common stock to the following persons and in the following amounts:

| | Preferred Stock | Common Stock |
| --- | --- | --- |
| Bert Gaddis | 1,166 | 1,166 |
| H. E. Koopman | 2,917 | 2,917 |
| Cresslen Corporation | 2,917 | 2,917 |
| E. W. Marland Company, Inc. | 7,000 | 7,000 |

The Cresslen Corporation was a family corporation of Alexander.

turn over the stock to Phillips, which was done. At the same time the note was marked "Cancelled by delivery of stock under contract of August 27, 1930" and returned to Brown. On August 26, 1935, Phillips delivered to Reda the certificates of stock received from the Bank, and requested the issuance of new certificates therefor to Phillips. On the same day Reda issued and delivered to Phillips certificates of Reda stock signed by Brown, as president, and Beesley, as assistant secretary, as follows:

Certificate No. 525  36,500 shares common

Certificate No. 526  99,450 shares common

Certificate No. 471  36,500 shares preferred.

The delivery of the stock to Phillips and the cancellation of the note by Brown were intended by Brown and Phillips to terminate the transaction and vest title to the stock in Phillips. It was so understood by Alexander and Van Wert. Alexander knew of the transaction the day it was consummated and Van Wert learned of it about three days thereafter. Alexander expressly authorized Brown to terminate the transaction by delivering the stock to Phillips in exchange for his canceled note. Alexander and Van Wert made no claim or demand on Phillips with respect to the challenged shares until on or about March 29, 1939. On that date, they made a written demand upon Phillips to deliver 46,230 shares of common stock to Alexander and 34,665 shares of common stock to Van Wert and to account to them for their share of the dividends received by Phillips in excess of the amount required to repay the Brown loan, with interest.

At the time the deposited stock was delivered to Phillips it did not have a value equal to, and could not have been sold for, the amount of the Brown note. The stock enhanced in value and sold in substantial quantities in 1937 for $12 to $14 per share.

The failure of Brown to sell the full 90,000 shares of Reda preferred stock by August 31, 1930; the purchase by Brown from Reda of 36,500 shares of Reda preferred and a like number of common on August 27, 1930; the payment of $365,000 by Reda to Phillips on the same day; the acceptance thereof by Phillips as the balance due it under the contract of March 15, 1930, and the failure of Reda to realize from the transactions the entire $430,000 for working capital were all matters disclosed by the books and records of Reda.

At the annual stockholders meeting held on March 24, 1931, Arutunoff protested the voting of the challenged shares issued to Brown on the ground the stock was invalidly issued. Similar protests were made at the stockholders annual meetings held on March 27, 1934, and March 24, 1936, respectively. Arutunoff challenged the validity of the issuance of the challenged shares to Brown in a letter to the stockholders dated March 15, 1935. At the stockholders annual meetings in 1931, 1934, and 1936, the stockholders voted to recognize the voting rights of the challenged shares, the vote in 1931 and in 1936 being a clear majority of the voting shares represented at such meetings, exclusive of the challenged shares.

The directors declared and paid dividends on Reda stock, including the challenged shares, on each of the following dates: November 12, 1936, December 29, 1936, March 27, 1937, June 29, 1937, November 6, 1937, December 22, 1937, April 5, 1938, July 7, 1938, October 10, 1938, December 21, 1938, and April 10, 1939.

Upon the stock of record held by Phillips, up to and including May 31, 1939, it received in dividends $658,574.13. Dividends from May 31, 1939, to June 1, 1940, aggregating $112,417.50, have been held in suspense.

After Brown had failed to sell all the 90,000 shares of preferred stock by August 31, 1930, Reda did not offer to deliver the unsold remainder thereof to Phillips or demand that it either sell such stock and from the proceeds thereof pay to Reda an amount which would bring its working capital up to $430,000, or retain such stock and pay Reda an amount which would bring its working capital up to $430,000. On September 9, 1930, the directors passed a resolution instructing the officers to discontinue the sale of preferred stock when sales had reached 80,000 shares, and at a meeting of stockholders of Reda held on October 21, 1937, a resolution was adopted to convert all the preferred shares into common on the basis of two shares of common for one share of preferred.

The board of directors of Reda elected in March of each year consisted of seven members. From March 24, 1930, to March 24, 1931, four directors were not financial-

ly interested in the challenged shares issued to Brown. From March, 1937, to May 18, 1940, not less than four directors were not financially interested in the challenged shares issued to Phillips. During the year 1938, there were five directors who were not interested therein.

Between April 17, 1937, and June 10, 1937, Phillips sold a total of 16,000 shares of common stock out of certificate No. 526, which certificate covered the challenged shares originally issued to Brown, and received therefor $132,820.

On July 23, 1937, Phillips entered into a contract with Russell McGuire & Company[7] for the sale of all the shares of Reda stock held by Phillips, consisting at that time of 192,950 shares of common, for a total consideration of $2,315,400. Under the agreement, $240,000 for 20,000 shares was to be paid on the tenth day after the date of the contract. That portion of the sale was consummated. Under the agreement, payment of the balance of $2,705,400 for the remaining 172,950 shares was to be made only after a registration statement under the Securities Act of 1933, as amended, 15 U.S.C.A. § 77a et seq., had been duly declared effective by the Securities and Exchange Commission and such shares had been duly listed and declared eligible for trading on the New York Curb Exchange. By the terms of an amendment to the contract dated November 3, 1937, Phillips was required to reimburse McGuire for all expenses up to $10,000 incurred incidental to the registration of such shares with the Securities and Exchange Commission. Reda and all the officers and directors thereof had knowledge of the last two mentioned contracts and the directors of Reda on July 19, 1937, formally resolved that Reda would cooperate with Phillips in registering such stock with the Securities and Exchange Commission and in listing it on the New York Curb Exchange. Reda, its officers, and directors did cooperate with Phillips in registering such stock and filed with the Securities and Exchange Commission a registration statement. In written statements to the Securities and Exchange Commission, Alexander and Van Wert certified that Phillips was the owner of the stock issued to it and actively cooperated with Phillips in its effort to comply with the contract with McGuire. In the regis-

tration statement, Reda repeatedly stated that 192,950 shares of Reda common were owned by Phillips. At that time neither Alexander, Van Wert, nor Reda was making any claim against Phillips.

The sale of the remaining 172,950 shares to McGuire was not consummated and Phillips still retains such shares. Phillips paid McGuire $10,000 as reimbursement for expenses incurred in connection with the registration.

In the course of the proceedings to register the stock, attorneys for the proposed purchaser questioned the validity of 69,543 shares of common stock which had been issued as a bonus to purchasers of preferred stock in consideration of the par value paid for the preferred stock. Phillips was the holder of 36,500 shares of the common stock thus questioned. On October 6, 1937, Phillips, the Cresslen Corporation, and Brown submitted to Reda a written proposal to settle the controversy on behalf of all stockholders similarly situated for the sum of $75,000. Alexander and Van Wert formally accepted the offer in writing and recommended the submission thereof to the stockholders. At a special meeting of the stockholders called by Alexander, as president of Reda, and held on October 21, 1937, the proposal was accepted by the stockholders. The resolution of the stockholders accepting the offer of compromise expressly discharged all the parties, except Arutunoff, from any and all further obligations under the contract of March 15, 1930. Phillips paid the sum of $75,000 to Reda in consummation of the settlement and received reimbursement from Alexander in the sum of $50 and Arutunoff in the sum of $10. At the time of such settlement, Alexander, Van Wert, and Reda were not claiming any interest in the challenged shares.

Alexander was a member of the board of directors of Reda for the years 1930 to 1938, inclusive. He was president of Reda for the year 1937. He was director, vice president, and general manager of Phillips from January 1, 1929, until February 26, 1934. Van Wert was a director of Reda from the time of its organization in 1930 to and including August 9, 1937.

Separate actions were brought by Alexander and Van Wert against Phillips and Reda.[8] In his complaint, Alexander al-

[7] Hereinafter called McGuire.

[8] Alexander's action was commenced April 15, 1939. Van Wert's action was commenced on the same date.

602

leged that he was the owner of 46,230 shares of Reda stock which was a portion of the shares pledged by Brown to Phillips under the contract of August 27, 1930; that such stock was pledged to Phillips to secure the payment of a note given by Brown for the sum of $365,000; that such stock was never sold under the pledge and never became the property of Phillips; that the dividends on the stock received by Phillips had repaid the entire amount of the loan, with interest. Alexander sought an accounting for the dividends received by Phillips and a determination of the amount due on such note, and that he be permitted to redeem such stock from the pledge and recover possession thereof. The allegations of the Van Wert complaint and the relief sought were substantially identical with the Alexander complaint, except as to the amount of stock claimed.

In its answer to the Alexander complaint, Phillips denied that the contract of August 27, 1930, constituted a pledge and alleged that Brown's note of August 27, 1930, was canceled and returned to him on or about August 26, 1935, in consideration of which Brown on the same date authorized the Bank to deliver to Phillips all the stock referred to in such contract; that the note was canceled and the stock delivered to Phillips; and that Phillips has since been the owner of such stock. Phillips further alleged that Alexander's claim was barred by the statute of limitations, laches, and estoppel. It filed a similar answer to the Van Wert complaint.

On May 18, 1940, Reda filed an amended counterclaim and a third party complaint in which it made Brown an additional party defendant. It alleged that the challenged shares issued in the name of Brown were issued without any consideration, or for a grossly overvalued consideration, and that Phillips and Brown failed to perform their agreement to provide working capital for Reda under the contract of March 15, 1930. Reda sought cancellation of the certificates representing the challenged shares and an accounting for the profits realized therefrom and the dividends received thereon by Phillips and Brown. Phillips answered denying that it breached the contract of March 15, 1930, and alleged that the stock was issued for a valid and adequate consideration, and that Reda's action was barred by limitation, laches, estoppel, and acquiescence.

The court held that the contract of August 27, 1930, constituted a pledge, but that it had been validly terminated by agreement between Brown and Phillips on August 26, 1935, and that such agreement was binding upon Alexander and Van Wert, and that their respective actions were barred by limitation and laches. It held that the challenged shares were issued for a valuable consideration, and that Reda's action was barred by limitation and laches.

From a judgment in favor of Phillips, Alexander, Van Wert, and Reda have appealed.

### Numbers 2463 and 2464
### 1. The Status of the Claims.

Brown agreed to assign portions of the challenged shares to Alexander and Van Wert if, as, and when such shares had been issued and delivered to him under the terms of the contract of March 15, 1930. Hence, Alexander and Van Wert's rights to such assignments were conditioned by the provisions of paragraph 11 of the contract of March 15, 1930. Brown failed to sell sufficient preferred stock by August 31, 1930, to provide funds for the reimbursement of Phillips for the advances made by it. As a result, the challenged shares were not delivered to Brown, and Alexander and Van Wert did not become entitled to the delivery thereof under their assignment contracts. On August 28, 1930, with full knowledge of the terms and provisions of the contract of August 27, 1930, Alexander and Van Wert in writing expressly consented thereto and to the deposit of the challenged shares in the Bank to be disposed of under the terms and provisions of that contract, and agreed that their right to receive any portion thereof should arise only in the event Brown eventually received the challenged shares or some portion thereof. Brown, having failed to make payment to Phillips of the $365,000, or any part thereof, with interest, under the contract of August 27, 1930, never became entitled to the delivery of any part of the challenged shares. Since the rights of Alexander and Van Wert to have a portion thereof assigned to them were to arise only if, as, and when the challenged shares had been issued and delivered to Brown, pursuant to the contracts of March 15, 1930, and August 27, 1930, it may be doubted that their right to assignments of a portion thereof ever ripened.

## 2. Pledge.

■ It is our opinion that the contract of August 27, 1930, did not constitute a pledge. The necessary elements of a pledge are (1) a pledgor and pledgee, (2) a debt or obligation, (3) a contract of pledge. In order to constitute a contract one of pledge the following elements are necessary: (1) The possession of the pledged property must pass from the pledgor to the pledgee or to some one for him; (2) the legal title to the pledged property must remain in the pledgor; (3) the pledgee must have a lien on the property for the payment of a debt or performance of an obligation due him by the pledgor or some other person; and (4) there must be a right of redemption in the pledgor. The applicable Oklahoma Statutes are set forth in Note 9.[9]

■ In First National Bank of Gradfield v. Hinkle, 65 Okl. 62, 162 P. 1092, 1093, the court said:

"It is inherent in the nature of a contract of pledge that the pledged property is delivered as security for a debt, or the performance of an obligation, * * *."[10]

While, by the terms of the promissory note of August 27, 1930, and the several renewals thereof, the stock was pledged to secure the payment of the notes, respectively, the evidence established and the trial court found that it was the intention of the parties that Brown should not be personally obligated to pay the notes. Furthermore, the notes were expressly made subject to the contract dated August 27, 1930, deposited with the stock, and the terms of that contract made it abundantly clear that Brown was not to be under any personal obligation to Phillips to pay the notes. The contract expressly provided that if Brown paid the $365,000, with interest, at the time stipulated in the contract, the stock should be delivered by the Bank to Brown, but that if he failed to pay such amount, with interest, within the time stipulated in the contract, the note should be canceled and returned to Brown, and the stock should be delivered to Phillips. It gave two alternatives to Brown: (1) to pay the note, with interest, at the time stipulated in the contract, and receive the stock, or (2) to receive the note back canceled and forfeit any right to receive the stock. It did not bind Brown to pay the note or perform any other obligation. It gave him the option of either paying the note or receiving it back canceled.

In the case of Beverly Hills Nat. Bank & Trust Co. v. Martin, 185 Okl. 254, 91 P.2d 94, 99, the bank asserted ownership of certain stock as executor of the estate of Cora B. Funk on the theory that the stock had been pledged by Funk during her lifetime to secure an indebtedness of $7,500 owing her half brother, Charles A. Bliss. Funk had executed and Bliss had approved a trust agreement which provided that upon her death the stock should be delivered to and become the property of Bliss. It gave her the right to terminate the trust by paying the trustee for the use and benefit of Bliss the sum of $7,500, and provided that upon such payment the trust should terminate and the trustee should deliver the stock to Funk. The court held that the effect of the trust agreement was to terminate the relation of debtor and creditor between Funk and Bliss. It said the debt was superseded by what might be termed a conditional right of revocation comparable to a right to repurchase. It then quoted from 41 C.J., p. 326, as follows:

" 'If it is a debt which the grantor is bound to pay, which the grantee might collect by proper proceedings, and for which the deed of the land is to stand as security, the transaction is a mortgage; but if it is entirely optional with the grantor to pay the money and receive a reconveyance or not to do so, he has not the rights of a mortgagor, but only a privilege of repurchasing the property.' "[11]

---

[9] 55 O.S.1941 § 1. "Pledge is a deposit of personal property by way of security for the performance of another act."

55 O.S.1941 § 19. "The sale by a pledgee, of property pledged, must be made by public auction, * * *"

55 O.S.1941 § 24. "A pledgee or pledgeholder may purchase the property pledged by direct dealing with the pledgor, in good faith."

42 O.S.1941 § 1. "A lien is a charge imposed upon specific property, by which it is made security for the performance of an act."

42 O.S.1941 § 5. "Contracts of mortgage and pledge, are subject to all the provisions of this chapter."

[10] See, also, Jackson v. Kincaid, 4 Okl. 554, 46 P. 587.

[11] See, also, Conway's Executors v. Alexander, 7 Cranch. 218, 236, 3 L.Ed. 321; Voris v. Robbins, 52 Okl. 671, 153 P. 120, 124; Hall v. Russell, 72 Okl. 47, 50, 178 P. 679, 682; Renas v. Green, 88 Okl. 169, 170, 212 P. 755, 756;

### 3. The Delivery of the Stock to Phillips.

Even if we assume the terms of the note created a pledge and that the provision in the contract for the delivery of the stock to Phillips was invalid, there is no legal impediment to a pledgor agreeing to transfer the pledged property to the pledgee in satisfaction of a debt secured by the pledge.[12] By the joint letter of Brown and Phillips to the Bank dated August 26, 1935, the Bank was instructed to turn the stock over to Phillips. Pursuant to that letter, the stock was delivered to Phillips and Brown's note was canceled and returned to him. The trial court found that Brown and Phillips by that transaction intended to terminate the contract of August 27, 1930, and vest title to the stock in Phillips. The evidence abundantly supports that conclusion. At that time the market value of the stock was much less than the $365,000 advanced by Phillips, plus accrued interest thereon. The transaction was fair, free from fraud, and was carried out in good faith.

### 4. Agency.

Alexander expressly authorized Brown to terminate the contract of August 27, 1930, by delivering the stock to Phillips in exchange for his canceled note, and he is bound by that transaction. But, had Alexander not so consented, the evidence established ratification of the transaction on the part of Alexander and Van Wert. They consented that the challenged shares should be issued in Brown's name and that their rights to assignments of a portion thereof should arise only if, as, and when such shares should be issued and delivered to Brown under the contract of March 15, 1930. When Brown failed to carry out the latter contract, they expressly consented to the contract of August 27, 1930, and that their rights to assignments of a portion of the challenged shares should be conditioned on Brown carrying out that contract. They further consented to the successive renewals of the note and permitted Brown to handle the entire transaction with Phillips respecting the challenged stock. Alexander learned on August 26, 1935, that Brown had caused the stock to be delivered to Phillips in exchange for his canceled note and that Phillips had received the stock as absolute owner. Shortly thereafter, full knowledge of the transaction came to Van Wert. Thereafter, as directors of Reda, Alexander and Van Wert acquiesced in treating Phillips as the absolute owner of the stock, in the payment of dividends thereon to Phillips and in the voting thereof by Phillips at stockholders' meetings, and certified to the Securities and Exchange Commission that Phillips was the owner of the stock. They cooperated with Phillips in registering the stock with the Securities and Exchange Commission and on the New York Curb. They asserted no claim to the challenged shares until March 29, 1939.

Silence under such circumstances when, according to the ordinary experience and habits of men, one would naturally speak if he did not consent, is evidence from which assent may be inferred.[13]

It is the rule in Oklahoma that where a principal, with knowledge of the unauthorized act of his agent, remains silent and acquiesces therein for an unreasonable time, he will be presumed to have ratified such unauthorized act.[14]

McKean v. McLeod, 81 Okl. 77, 78, 196 P. 935; Taylor v. Campbell, 139 Okl. 110, 113, 281 P. 243, 245; Edmundson v. State, 181 Okl. 150, 73 P.2d 150, 154; Moore v. Beverlin, 186 Okl. 620, 99 P.2d 886.

[12] 55 O.S.1941 § 24; Moore v. Beverlin, 186 Okl. 620, 99 P.2d 886, 888.

[13] Wolfe v. Texas Company, 10 Cir., 83 F.2d 425, 431; Wolfe v. Shell Petroleum Corporation, 10 Cir., 83 F.2d 438, 442; Crane Co. v. James McHugh Sons, Inc., 10 Cir., 108 F.2d 55, 59.

[14] In Bell-Wayland Co. v. Bank of Sugden, 95 Okl. 67, 218 P. 705, 708, the court said:

"It is a rule of general application that the acts of a principal are to be liberally construed in favor of an adoption of the acts of his agent, and when the unauthorized acts of an agent are capable of ratification, evidence of acts or conduct of the principal in apparent approval of such act suffices, in the absence of evidence to the contrary, to raise a presumption of ratification. Thus, where with knowledge of the unauthorized acts of the agent there is a silence or acquiescence for an unreasonable time, without objection on the part of the principal, he will be presumed to have ratified such unauthorized acts."

And again, in Price v. Peeples, 66 Okl. 139, 168 P. 191, 193, the court said:

"It is a settled principle of law that the principal upon learning of the unauthorized act of his agent, if he does not

■ Silence on the part of the principal may be evidence from which a ratification of an unauthorized act of an agent may be inferred, although the person asserting ratification has not been misled or prejudiced thereby, and the elements of estoppel are not present.[15]

We conclude that Alexander and Van Wert fully ratified the delivery of the stock to Phillips in consideration of the cancellation and delivery of the note to Brown.

## 5. Laches.

After the Reda stock was delivered by the Bank to Phillips, it expended $5,584 for revenue stamps necessary to effect a transfer, $75,000 to clear the title to the stock, and $10,000 for registering the stock with the Securities and Exchange Commission and to list it on the New York Curb Exchange. In the meantime, Alexander and Van Wert not only failed to give Phillips notice of any claim respecting the challenged shares, but treated Phillips as the owner thereof and actively cooperated with Phillips in effecting the settlement with Reda and in registering and listing the stock. Between August 26, 1935, when the stock was delivered to Phillips, and March 29, 1939, when first notice of the claim was given Phillips, the stock had substantially increased in value.

■ Laches consists of two elements, inexcusable delay in instituting suit and prejudice resulting to the defendant from such delay. Its existence depends upon the equities of the case, and not merely upon the lapse of time.[16] In O'Brien v. Wheelock, 184 U.S. 450, 493, 22 S.Ct. 354, 370, 46 L.Ed. 636, the court said:

"The doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time is thoroughly settled. Its application depends on the circumstances of the particular case. It is not a mere matter of lapse of time, but of change of situation during neglectful repose, rendering it inequitable to afford relief."

■ A person may not withhold his claim awaiting the outcome of a doubtful enterprise and, after the enterprise has resulted in financial success favorable to the claimant, assert his interest, especially where he has thus avoided the risks of the enterprise. The injustice of permitting one, holding the right to assert an interest in property of a speculative character, to voluntarily await the event and then decide, when the danger is over and the risk has been that of another, to come in and share the profit, is obvious.[17] In such circumstances, persons having claims to property are bound to use the utmost diligence in enforcing them.[18]

■ A substantial increase in the value of the property involved, where the right could have been asserted before such increase and the granting of relief would work inequity, is a circumstance which may be considered in applying the doctrine of laches.[19]

■ Where a plaintiff, with knowledge of the relevant facts, acquiesces for an unreasonable length of time in the assertion of a right adverse to his own, the court may presume assent to the adverse right, and the consequent waiver of the right sought to be enforced.[20]

intend to be bound thereby, must within a reasonable time repudiate it."
See Mechem on Agency, 2d Ed., Vol. 1, § 453.
[15] Lynch v. Smyth, 25 Colo. 103, 54 P. 634, 636, 637; Thompson v. Murphy, 60 W.Va. 42, 53 S.E. 908, 910, 911, 6 L.R.A.,N.S., 311; Stiebel v. Haigney, 134 App.Div. 516, 119 N.Y.S. 455, 458.
[16] United States v. Alex Dussel Iron Works, Inc., 5 Cir., 31 F.2d 535, 536; Standard Oil Co. of Colorado v. Standard Oil Co., 10 Cir., 72 F.2d 524, 527; Winn v. Shugart, 10 Cir., 112 F.2d 617, 623; Parks v. Classen Co., 156 Okl. 43, 9 P.2d 432, 435; Harjo v. Johnston, 187 Okl. 561, 104 P.2d 985, 998.
[17] Preston v. Kaw Pipe Line Co., 10 Cir., 113 F.2d 311, 313; Winn v. Shugart, 10 Cir., 112 F.2d 617, 623; Twin-Lick Oil Co. v. Marbury, 91 U.S. 587,

593, 23 L.Ed. 328; Johnston v. Standard Mining Co., 148 U.S. 360, 371, 13 S.Ct. 585, 37 L.Ed. 480.
[18] Patterson v. Hewitt, 195 U.S. 309, 321, 25 S.Ct. 35, 49 L.Ed. 214; Johnston v. Standard Mining Co., 148 U.S. 360, 371, 13 S.Ct. 585, 37 L.Ed. 480; Beck v. Cagle, 46 Cal.App.2d 152, 115 P.2d 613, 619; James v. Anderson, 39 N.M. 535, 51 P.2d 601, 605; Livermore v. Beal, 18 Cal.App.2d 535, 64 P.2d 987, 995.
[19] Akley v. Bassett, 68 Cal.App. 270, 228 P. 1057, 1066; Union Oil & Gas Co. v. Cross, 220 Ky. 271, 295 S.W. 172, 174; McNair v. Sockriter, 199 Iowa 1176, 201 N.W. 102, 105.
[20] Parks v. Classen Co., 156 Okl. 43, 9 P.2d 432, 435; Pomeroy's Eq.Jur., 4th Ed., § 965; 30 C.J.S., Equity, § 117, p. 539.

■ Laches will not be imputed to one who has been justifiably ignorant of the facts creating his right or cause of action, and who, therefore, has failed to assert it. But where the facts were known to the plaintiff, ignorance of the law applicable thereto and the consequent ignorance of his legal rights, will not ordinarily excuse delay in asserting the claim.[21]

Here, Alexander and Van Wert were fully cognizant of the pertinent facts respecting their claim to the challenged shares, if any they had, and were merely ignorant with respect to their alleged legal rights.

■ We conclude that the claims of Alexander and Van Wert were barred by laches.

### Numbers 2465 and 2466
#### 1. Consideration.

The purpose of the contract of March 15, 1930, was to provide for the organization of Reda, the liquidation of the advances which had been made by Phillips to Arutunoff and Bart, and the acquisition by Reda of all the property and assets of Bart, the interests of Phillips, Arutunoff, and Van Wert in the patents and patent applications, and any future patents which should be granted to them pertaining to electric motors or electric motor-driven pumps. Every provision of the contract was essential to the effecting of its primary objective.

■ In United States v. Bethlehem Steel Corp., 315 U.S. 289, 298, 62 S.Ct. 581, 587, 86 L.Ed. 855, the court said:

"Whether a number of promises constitute one contract or more than one is to be determined by inquiring 'whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.' Williston on Contracts, Rev.Ed., § 863."

■ A consideration of the provisions of the contract of March 15, 1930, and the purpose and object thereof leads to the conclusion that the parties assented thereto as a single whole. It follows that all of the properties received by Reda pursuant to such contract were considera-tion for each share of stock issued under the terms thereof, other than the preferred stock sold for cash. Furthermore, the resolution by which Reda ratified and adopted the contract of March 15, 1930, shows clearly that the consideration for the issuance of the challenged shares was the assignment by Phillips to Reda of its 510 shares in Bart and its interest in the contracts of June 15, 1926, and January 4, 1927. That Reda received valuable property and patent rights under the contract of March 15, 1930, cannot be doubted. While Bart lacked working capital and had not realized profits, it possessed a manufacturing plant, manufacturing equipment, inventories, and valuable patent rights. Its assets on the basis of cost less depreciation were $337,894.83. With the assets thus acquired and working capital obtained from the sale of preferred stock, Reda realized very substantial profits, from which up to April, 1940, it paid dividends in excess of $2,000,000. The property and the patent rights transferred to Reda constituted a valuable and legal consideration for the stock issued therefor.

■ Reda being a Delaware corporation, the law of Delaware governs the validity of the stock issued by Reda.[22] Under § 3, Art. IX of the Constitution of Delaware the stock could be lawfully issued in exchange for property. In the absence of actual fraud, the judgment of the directors as to the value of property received in exchange for the stock is conclusive.[23]

■ The common stock was no par value stock. All of the common stock originally issued was in exchange for property and all the original stockholders, with full knowledge of the facts, consented thereto. The rights of creditors were not involved. Such property had a substantial value. Reda had no assets other than the property thus acquired until moneys were derived from subsequent sales of preferred stock. The original stockholders agreed among themselves as to the number of shares of stock each was to receive. The number of common shares issued in exchange for the prop-

---

21 Becker Steel Co. of America v. Cummings, 2 Cir., 95 F.2d 319, 320; Le Gout v. Le Vieux, 338 Ill. 46, 169 N.E. 809, 811; State v. American Colony Ins. Co., 336 Mo. 406, 80 S.W.2d 876, 890; Jones v. Perkins, C.C.Mich., 76 F. 82, 85.

22 Fletcher Cyc. Corporations, Perm. Ed., Vol. 11, § 5208; Restatement, Conflict of Laws, §§ 182, 183; Harrigan v. Bergdoll, 270 U.S. 560, 564, 46 S.Ct. 413, 70 L.Ed. 733.

23 Rev.Code, Del., 1935, § 2046.

erty was, therefore, immaterial, since each share issued evidenced a proportionate stockholder's interest in Reda's assets.[24]

■ The owners of all the original stock issued by Reda, with full knowledge of the facts, gave assent to the provisions of the contract of March 15, 1930, and its adoption and ratification by Reda. They were the persons interested in the transactions carried out under that contract and any rights of Reda arising from such transactions. It follows that any ultimate profits made by transferors of property to Reda pursuant to that contract were neither secret nor unlawful.[25] The carrying out of the provisions of that contract did not result in wrong to anyone. Reda, with full knowledge of all the facts, and the consent of all interested stockholders, ratified and adopted the contract before the rights, if any, of subsequent purchasers of stock intervened.[26]

## 2. No Breach of Contract.

■ Neither Phillips nor Brown breached the literal provisions of paragraph 11 of the contract of March 15, 1930, with respect to providing a working capital for Reda of $430,000. Phillips' obligation to receive the unsold portion of the 90,000 shares of preferred stock and to either retain or sell the same and pay to Reda an amount which, with the amounts already received by Reda from the sale of preferred stock, would provide it a working capital of $430,000, was contingent on Phillips not having been paid on or before August 31, 1930, the amounts advanced by it to Bart and Arutunoff. On August 27, 1930, there was still due Phillips, $365,000. That amount was paid to Phillips by Reda on August 28, 1930, from funds derived from the sale of 36,500 shares of preferred stock to Brown. Neither was the contract breached by the payment to Phillips of the whole amount received from the sale of 36,500 shares of preferred stock, since the contract provided that Phillips should be paid not less than one-half of the proceeds from the sale of the preferred stock until it had been fully reimbursed for its advances to Bart and Arutunoff. It is true that Phillips advanced to Brown the funds with which to purchase such preferred stock and that Brown was the president of Reda at the time of the transaction. Whether the transaction could have been rescinded by Reda, had it acted promptly, we do not now determine. For reasons hereinafter stated, we are of the opinion that Reda is barred from rescinding that transaction because of acquiescence and laches. The challenged shares were issued to Brown by Reda for a legal consideration moving to it. The disposition thereof was a matter between Phillips and Brown. Phillips was entitled to the stock when Brown failed to carry out his part of the contract of March 15, 1930. That Phillips entered into the contract of August 27, 1930, which accorded Brown a further opportunity to acquire the challenged shares, was no concern of Reda. The deposit of the stock in the Bank was for the protection of Phillips, not of Reda, and Reda was in nowise in-

---

[24] Bodell v. General Gas & Electric Corp., 15 Del.Ch. 119, 132 A. 442, 447; Fletcher Cyc. Corporations, Perm.Ed., Vol. 11, § 5201; Finch v. Warrior Cement Corp., 16 Del.Ch. 44, 141 A. 54, 61.

[25] Arn v. Dunnett, 10 Cir., 93 F.2d 634, 636, 637, where the court said:

"Promoters occupy a relation of trust to the corporation which they caused to be organized. They may make a sale of their property to the corporation, but they may be required to disgorge a secret or unlawful profit resulting from such a sale. A profit is not secret or unlawful, however, if all persons having a present interest in the transaction know the facts and give assent to it. And owners of all of the stock of a corporation are the persons having an interest in a transaction so far as the rights of the corporation extend. Further, the duty of full disclosure in a transaction of that kind is confined to persons having an interest in the

corporation at the time. It does not extend to those subsequently acquiring shares of stock. * * * The effect of the transaction was that the corporation acquired and became owner of the property free of obligation, and the promoters owned the stock; and the value of the stock was measured by the value of the royalties. All parties having any interest whatever in the corporation knew the facts and assented to the transaction. There were no other stockholders; there was no secrecy; and no facts were withheld from the promoters or any one having an interest in the corporation. The corporation was not injured through fraud, secrecy, or otherwise; and it could not complain."

[26] Old Dominion Copper Co. v. Lewisohn, 210 U.S. 206, 28 S.Ct. 634, 52 L. Ed. 1025; Henderson v. Plymouth Oil Co., 16 Del.Ch. 347, 141 A. 197, 203, 204.

terested therein. Brown was under no binding obligation to sell the 90,000 shares of preferred stock. His contractual obligation was to endeavor to sell such preferred stock and his failure so to do imposed no liability on Brown to Reda.

Reda at no time tendered the unsold portion of the 90,000 shares of preferred stock to Phillips, nor demanded that Phillips take such unsold preferred stock and pay Reda an amount which, with the amounts already realized by Reda from the sale of preferred stock, would bring its working capital up to $430,000. Furthermore, on September 9, 1930, the directors of Reda adopted a resolution to discontinue the sale of preferred stock when sales had reached 80,000, and on October 21, 1937, Reda determined to convert all the preferred shares into common on the basis of two shares of common for one share of preferred. The preferred stock was so converted on that basis.

The transactions under the contracts of March 15, 1930, and August 27, 1930, did not result in Phillips receiving the amount of its advances and the challenged shares. All the assets of Bart acquired by Reda resulted from the advances of Phillips to Arutunoff and Bart, except the 49 per cent of Bart's stock which was transferred by Arutunoff to Reda. For those assets Phillips received in cash $39,115, 36,500 shares of preferred stock, and 135,950 shares of common stock. It did not in fact realize the $365,000 paid to it by Reda, since Phillips advanced that amount to Brown to purchase the stock from Reda, and ultimately received stock in liquidation of that obligation. Phillips was willing from 1930 to 1935 to accept the amounts it had advanced, with interest, and step out of the picture. But no one was willing to provide the necessary funds and take the risk of what was as yet a losing venture.

Brown never realized any profit from the transaction. Being unable to satisfy his obligation to Phillips, the challenged shares, 36,500 shares of common stock, and 36,500 shares of preferred stock all went to Phillips in satisfaction of Brown's obligation to Phillips.

### 3. Laches and Acquiescence.

The facts with respect to the issuance of the challenged shares, the transactions between Brown and Reda, Phillips and Reda, and Brown and Phillips were all disclosed by the books and records of Reda. From March 24, 1930, to March 24, 1931, a majority of the directors of Reda were not financially interested in the challenged shares. The same situation existed from March, 1937, to May, 1940. The stockholders of Reda at each of the annual meetings in 1931, 1934, and 1936, after challenge by Arutunoff of the right to vote such shares and with full knowledge of the facts, by a clear majority of the outstanding stock, exclusive of the challenged shares, recognized their validity. The directors of Reda declared and paid dividends on the challenged shares from November 12, 1936, to April 10, 1939. From July 23, 1937, to September, 1939, Reda, acting both through its directors and stockholders, participated in the proceedings to register with the Securities and Exchange Commission 192,950 shares of common of Reda, including the challenged shares, held and owned by Phillips, and on numerous occasions filed with the Securities and Exchange Commission detailed statements under oath reciting the history of Reda's organization, its development, and the issuance of its shares, and stating that 192,950 shares were owned by Phillips. From April 17, 1937, to August 3, 1937, Reda acquiesced in the sale by Phillips of 36,000 shares of Reda stock to various persons and transferred such stock on its books to the purchasers thereof. On September 11, 1937, Reda received a legal opinion from its Delaware counsel that all of the common stock, except 69,453 shares issued as a bonus of one share of common for each share of preferred purchased, was validly issued. On December 4, 1937, Reda received an opinion from its Oklahoma counsel to the effect that all of Reda outstanding shares of common stock were validly issued. It incorporated those two opinions in its registration statement filed with the Securities and Exchange Commission. On October 21, 1937, Reda by a vote of its directors and stockholders accepted the compromise offer of $75,000, which was paid by Phillips, and in its resolution of acceptance discharged all the parties, except Arutunoff, from any and all further obligations under the contract of March 15, 1930.

When Phillips accepted the stock in satisfaction of the amount advanced by it to Brown, the value of the stock was substantially less than such amount, with accrued interest. The value of the stock substantially increased before Reda asserted its claim.

Phillips was the principal purchaser of Reda's manufactured products and carried on extensive experiments and suggested many improvements to Reda, which Reda adopted.

Reda's cause of action, if any, arose not later than August 31, 1930. With full knowledge of the facts, it waited from the date the cause of action accrued until August 2, 1939, to assert its claim.

■ The fact that a minority of the directors were interested in the transaction did not excuse the long delay in bringing the action.[27]

■ When a party with full knowledge of all the material facts, acts in recognition of the validity of a transaction, or inconsistent with its repudiation, and permits the other party to deal with the subject matter under the belief that the transaction is recognized as valid, and fails for a long period to challenge the transaction, his acquiescence renders the transaction unimpeachable in equity.[28]

■ During the period that intervened between the accrual of the cause of action and the filing of the original cross-complaint, Phillips, in addition to paying $75,000 pursuant to the compromise settlement, expended its funds in securing the registration of the stock with the Securities and Exchange Commission and on the New York Curb, and carried the risk of the venture during the period from 1935 until Reda began to realize profits and the stock advanced to the point where it reached a value in excess of the amount advanced by Phillips to Brown.

We conclude that Reda's asserted cause of action was barred by laches and acquiescence.

The judgments are affirmed.

[27] See Hughes v. Reed, 10 Cir., 46 F. 2d 435, 441, 442; Curtis v. Connly, 257 U.S. 260, 264, 42 S.Ct. 100, 66 L.Ed. 222; Farmer v. Standeven, 10 Cir., 93 F.2d 959, 961, 962; Payne v. Ostrus, 8 Cir., 50 F.2d 1039, 1042, 1043, 77 A.L.R. 531; McNair v. Burt, 5 Cir., 68 F.2d 814, 815, 816.

[28] Pomeroy's Eq.Jur., 4th Ed., Vol. 11, § 965, p. 2094; Wagg v. Herbert, 19 Okl. 525, 92 P. 250, 266; Kimbell v. Chicago Hydraulic Press Brick Co., 8 Cir., 119 F. 102; Jackson v. Anderson, 355 Ill. 550, 189 N.E. 924, 927.